# IN THE COURT OF CHANCERY OF THE STATE OF DELAWARE

| | | |
|---|---|---|
| SANJIV MEHRA, individually, and SAMRITA MEHRA, as trustee of the SANJIV MEHRA 2014 IRREVOCABLE TRUST, <br><br> Plaintiffs, <br><br> v. <br><br> JONATHAN TELLER, EOS INVESTOR HOLDING COMPANY, LLC, ANGRY ELEPHANT CAPITAL, LLC, ANDREW SALTOUN, as successor trustee of the Teller Children's 2015 Trust, and SARAH SLOVER, <br><br> Defendants. | ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) | C.A. No. 2019-0812-KSJM |

## MEMORANDUM OPINION

Date Submitted:  October 8, 2020
Date Decided:  January 29, 2021

John L. Reed, Peter H. Kyle, Kelly L. Freund, DLA PIPER LLP (US), Wilmington, Delaware; Patrick J. Smith, Brian T. Burns, Nicholas J. Karasimas, SMITH VILLAZOR LLP, New York, New York; *Counsel for Plaintiffs Sanjiv Mehra and Samrita Mehra as Trustee of the Sanjiv Mehra 2014 Irrevocable Trust.*

Jon E. Abramczyk, D. McKinley Measley, Alexandra M. Cumings, Elizabeth A. Mullin, MORRIS, NICHOLS, ARSHT & TUNNELL LLP, Wilmington, Delaware; *Counsel for Defendants Jonathan Teller, EOS Investor Holding Company, LLC, Angry Elephant Capital, LLC, and Andrew Saltoun as Successor Trustee of the Teller Children's 2015 Trust, and Sarah Slover.*

**McCORMICK, V.C.**

This case involves a dispute between Jonathan Teller and Sanjiv Mehra over the dissolution of EOS Investor Holding Company, LLC ("Holdco"), a consumer goods company. Before the disputed dissolution, the two shared control of Holdco for years. Although Teller, a founder, held a greater equity stake in the company, Mehra took responsibility for most of the company's day-to-day management. The two agreed that these contributions warranted granting Mehra equal say over member and board decisions. The two also agreed that Mehra would have a right to equal distributions above a specified threshold.

The parties' agreements on shared control and equal distributions were memorialized in Holdco's LLC agreement. In relevant part, the LLC agreement made Teller and Mehra managers on the two-person board and required unanimity to effect board action. If Teller and Mehra deadlocked, the LLC agreement required that Holdco would be automatically dissolved. In the event of a deadlock-based dissolution, Holdco would distribute its shares of a first-tier subsidiary to Holdco members in proportion to their equity stakes and the members would replicate Mehra's equal-distribution rights at the first-tier subsidiary level.

Thus, while Teller had to abide by the shared-control arrangement for as long as the parties operated Holdco, the deadlock provision created a trapdoor with a hair trigger. If Teller wanted out, he could propose a business divorce to the Holdco board, declare deadlock if Mehra disagreed, and exit the shared-control arrangement.

After a few successful years, Holdco faced a series of setbacks, including a lawsuit regarding its signature lip balm, failed product launches, resource-draining international expansion, supply chain flaws, and a high rate of employee attrition. Cash flow shortages and other financial difficulties followed. By 2018, distributions had ceased, leaving Teller strapped for cash.

Holdco's financial difficulties strained the parties' relationship. Pressured by personal liquidity issues, Teller became more critical of Mehra's management. As the financial decline deepened, Teller paid greater attention to employee complaints about Mehra's management style and misuse of company resources. Teller came to blame Mehra for Holdco's problems and determined to cut ties with Mehra.

In September 2019, Teller began meeting with lawyers and devised a plan that would allow him to exit the shared-control arrangement. According to plan, Teller noticed a meeting of the Holdco board, which took place on September 26, 2019. Teller proposed a resolution at that meeting that would remove Mehra as the CEO of a Holdco subsidiary. Mehra refused to vote on Teller's proposal and countered with a proposal to remove Teller from his positions. Teller declared the board deadlocked and dissolved Holdco. Teller then distributed to Mehra his proportionate equity in Holdco's first-tier subsidiary. Teller failed to replicate Mehra's equal-distribution rights at the subsidiary level.

Mehra filed this lawsuit to invalidate the dissolution with the primary aim of restoring the shared-control arrangement. Mehra argues that the deadlock was a contrivance—an inauthentic dispute designed to deliver control over distributions to a cash-strapped Teller. He contends that Teller was obligated to protect Mehra's interests but failed to do so. Mehra moved to expedite the case and, in response, the court bifurcated the narrow issue of whether Holdco's dissolution was invalid.

This post-trial opinion resolves that narrow issue in Teller's favor. Although Teller contrived the circumstances giving rise to deadlock, Teller proved that the parties have an irreconcilable disagreement concerning Mehra's continuing management of Holdco. The deadlock, therefore, was genuine and sufficient to warrant dissolution.

Mehra has proven, however, that Teller breached his obligations to replicate Mehra's right to equal distributions. Although this is not a basis to invalidate the dissolution, Mehra will have future recourse against Teller for breach of this aspect of the LLC agreement.

## I.    STATEMENT OF FACTS[1]

Trial took place over three days. As reflected in the Schedule of Evidence submitted by the parties,[2] the record comprises 848 trial exhibits,[3] live testimony from six fact witnesses,[4] deposition testimony from ten fact witnesses,[5] and thirty-six stipulations of fact.[6] These are the facts as the court finds them after trial.

### A.    A Brief History of EOS

The collection of entities that operates as "EOS" sells small consumer goods. EOS's signature product is a spherical lip balm.

Before the disputed dissolution, EOS comprised three entities: Holdco (or the "Company"), a Delaware LLC; The Kind Group, LLC ("Kind," or the "Kind Group"), a New York LLC; and EOS Products, LLC ("Products"), a New York LLC.

---

[1] The Factual Background cites to: C.A. No. 2019-0812-KSJM docket entries by docket ("Dkt.") number; trial exhibits (cited by "JX" number); the trial transcript by page and line numbers (Dkts. 200–02) (cited as "Trial Tr."); deposition transcripts lodged with the Court (Dkt. 186 Exs. A–K) (cited as "Dep. Tr."); and facts stipulated in the parties' Joint Pre-Trial Stipulation and Order (Dkt. 188) (cited as "PTO").

[2] *See* Dkt. 212, The Parties' Joint Sched. of Evid.

[3] *Id.* Ex. A.

[4] *See* Trial Tr. at 322, 642, 927 (listing witness testimony by day).

[5] The Parties' Joint Schedule of Evid. Ex. B.

[6] PTO ¶¶ 21–56.

Teller and Mehra and affiliated entities owned all of the equity of Holdco.[7]

Holdco owned 66.3% of Kind;[8] the remaining 33.7% of Kind's membership interest

was owned by Teller, Mehra, an investment vehicle owned by Teller and his mother

called Angry Elephant Capital, LLC ("Angry Elephant"), and various other EOS

employees.[9] Kind wholly owned Products, the operating entity.[10]

Teller started Kind in 2006 with a friend, non-party Craig Dubitsky.[11] Teller

personally financed the company for the first few months[12] and then provided

financing through Angry Elephant.[13]

Mehra joined Kind in early 2008. By then, Kind had developed its first

product, a shaving cream,[14] and Teller and Dubitsky had formed Products as Kind's

---

[7] *Id.* ¶¶ 22–23, 25–26.

[8] *Id.* ¶ 29.

[9] *Id*. The pre-trial order cites to JX-459, a document detailing ownership of Kind as of September 25, 2019. *See id.*; JX-459. The ownership percentages in the pre-trial order do not add up to 100%. The actual breakdown of membership interests is as follows: 66.46% Preferred Interests, 0.15% Class A Interests, 26.72% Class B Interests, and 6.67% Class C Interests. *See* JX-459. Regardless, it suffices for the purpose of this decision to note that, since its formation, Holdco had complete managerial control over Kind. *See* PTO ¶¶ 29, 38.

[10] *Id.* ¶ 31.

[11] PTO ¶ 35; Trial Tr. at 391:4–10 (Teller).

[12] Trial Tr. at 391:11–19 (Teller).

[13] *Id.* at 395:3–8 (Teller); *see id.* at 389:19–390:2 (Teller) (describing Angry Elephant's ownership and purpose).

[14] *Id.* at 392:5–8, 22–23 (Teller).

operating subsidiary.[15] Mehra had the operational experience to commercialize EOS's products.[16] At first, Mehra acted as a consultant, offering guidance regarding commercialization of the shaving cream, advising on the competitive landscape of consumer goods, and providing access to his professional network.[17]

Kind released its shaving cream to the market in March 2008.[18] Next, Kind began developing a spherical lip balm, which it released in early 2009.[19] During this time, Dubitsky left EOS, and Mehra's role at EOS expanded.[20] By the end of 2008, Mehra was working full time for EOS.[21] Mehra took "full responsibility for everything," managing EOS and helping "Teller raise money for the business."[22]

Fueled by the success of its spherical lip balm, EOS became profitable toward the end of 2011.[23] That year, Mehra broadened his influence within the Company in two ways.

---

[15] PTO ¶ 35 ("Products was formed as an operating entity in 2008 . . . ."). *But see* Trial Tr. at 395:1–2 (Teller) ("[I]n November of 2007, we set up an LLC, EOS Products, LLC").

[16] Trial Tr. at 395:19–21 (Teller); *Id.* at 12:2–23 (Mehra).

[17] *Id.* at 14:13–22 (Mehra).

[18] *Id.* at 393:1–2 (Teller).

[19] *Id.* at 394:3–9, 398:22–5 (Teller).

[20] *See id.* at 399:11–400:15 (Teller); *id.* at 18:21–19:1 (Mehra).

[21] PTO ¶ 36; Trial Tr. at 398:7–10 (Teller); *id.* at 15:12–18 (Mehra).

[22] *Id.* at 20:18–23 (Mehra).

[23] *Id.* at 25:5–8 (Mehra).

First, Mehra acquired equity. After a restructuring, Mehra controlled approximately 15% of the membership interests in Holdco.[24] Teller controlled 85% of the membership interests through his interests (70%) and Angry Elephant's (15%).[25]

Second, Teller and Mehra decided that they would share managerial control. Mehra and Teller agreed that Mehra's influence would be equal "from an operational perspective," despite Teller's controlling interest.[26]

## B.    The LLC Agreement

Teller and Mehra executed an LLC Agreement for Holdco in 2011.[27] They amended the agreement twice—once in 2014 and once in 2016.[28] This decision refers to the agreement in its final form as the "LLC Agreement" or the "2016 LLC Agreement," and the prior versions as the "2011 LLC Agreement" and "2014 LLC Agreement."

---

[24] JX-3 Ex. A.

[25] *Id.*

[26] Trial Tr. at 23:19–23 (Mehra).

[27] JX-3.

[28] *See* JX-17 (amending and restating the Holdco LLC Agreement on July 29, 2014); JX-33 (amending and restating the Holdco LLC Agreement on May 26, 2016).

7

## 1. The Shared-Control Arrangement

The LLC Agreement memorializes the parties' agreement on shared control by granting Mehra veto power over decisions made at both the Member level and the Manager level.

The parties' codified their shared control over Holdco in Sections 3.03 and 4.01 of the LLC Agreement, which impacted decision-making at both the Member level and the Manager level.

At the Member level, Section 3.03 of the LLC Agreement holds that whenever "any . . . approval or consent is required to be given by the Company, by vote or otherwise, it shall be authorized upon receiving the affirmative vote of the Members holding not less than 90% of the Membership Interests."[29]

At the Manager level, the LLC Agreement established a two-person Board of Managers (the "Board") comprising Mehra and Teller. Section 4.01 of the agreement locks the two principals into that position "[u]nless and until" one of them resigns or their removal is approved "by a vote in writing of Members holding not less than 90% of the Membership Interests."[30]

Section 4.01 of the LLC Agreement further provides that "[n]o Manager shall individually have the authority to bind the Company," and that a Manager "may only

---

[29] LLC Agreement § 3.03.

[30] *Id.* § 4.01; JX-16.

bind the Company through actions taken or approved by the Board of Managers in accordance with the terms of this Agreement."[31]

Operating together, Sections 3.03 and 4.01 prevent Teller from using his 85% Membership Interest to unilaterally remove Mehra as Manager or take other action on behalf of Holdco without Mehra's consent while Holdco is operative.[32]

Section 4.03 requires that Teller and Mehra act "at all times in good faith and in such manner as may be required to protect and promote the interests of the Company and the Members."[33] The LLC Agreement does not waive or eliminate fiduciary duties under Delaware law.

### 2. The Distribution Scheme

The 2011 LLC Agreement included the typical language providing that distributions would be made "pro rata in accordance with [Members'] respective Membership Interests."[34] Given Teller's roughly 85% stake in the Company, this provision entitled Teller to the vast majority of Holdco's distributions. EOS, however, proved remarkably successful between 2011 through 2014 under Mehra's leadership. Thus, by 2014, the parties agreed to increase Mehra's economic rights to available cash flows. They altered the distribution scheme to reflect those rights.

---

[31] LLC Agreement § 4.01.

[32] *See id.* §§ 3.03, 4.01; *see also* JX-264 at EOS00012803.

[33] LLC Agreement § 4.03.

[34] JX-3 § 7.01(a)(i); *see also id.* Ex. A.

9

Article VII of the LLC Agreement governs "Distributions, Allocations of Income and Losses," and Section 7.01(a) governs "Distributions" aside from those made to cover tax losses.[35]

The 2014 LLC Agreement amended Section 7.01(a) by requiring that distributions of proceeds be made based on "Revised Sharing Percentages," a defined term that entitled Teller and Mehra each to roughly 49% of the distributions (and Angry Elephant to the remainder).[36] To make Teller and Angry Elephant whole for their larger capital investment, however, the LLC Agreement included an exception to the equal-distribution scheme.[37] As to distributions of "Extraordinary Proceeds," which were proceeds from a sale or similar transaction, the parties agreed that distributions would be made *pro rata* until the aggregate distributions hit a $250 million threshold.[38]

By 2016, the parties had agreed to simplify the distribution scheme. The 2016 LLC Agreement eliminates the distinction between ordinary proceeds and Extraordinary Proceeds and provides that all proceeds be distributed proportionate to the parties' Membership Interests until distributions in the aggregate (dating back

---

[35] JX-3 Art. VII.

[36] JX-17 § 7.01(a)(ii), Ex. A; *see also id.* § 1.01 (defining "Revised Sharing Percentages").

[37] Trial Tr. at 33:2–21 (Mehra) (explaining the parties' rationale for deviating from equal distributions to "give money back to [Teller's] mother" for Angry Elephant's investment and to ensure "money returned to equity holders").

[38] JX-17 § 7.01(a)(iii); *see also id.* § 1.01 (defining "Extraordinary Proceeds").

to July 29, 2014, the date of the 2014 LLC Agreement) hit a threshold of approximately $190 million.[39]  After meeting the threshold, the distribution scheme would switch to the equal-distribution arrangement based on the Revised Sharing Percentages.[40]  For simplicity, this decision refers to the terms of Section 7.01(a)(ii) as the "Equal-Distribution Arrangement."

In its final form, Section 7.01(a)(ii) provides as follows:

> Unless otherwise determined by the Managers, all Distributions shall be made to the Members pro rata in accordance with their respective Membership Interests; provided, however that, from and after the time that aggregate Distributions to the Members equal the Threshold, all subsequent Distributions shall be made to

[39] *See* LLC Agreement §§ 1.01, 7.01(a)(ii).

[40] *Id.* § 7.01(a)(ii); *see also id.* Ex. A (listing percentages).  The following chart tracks the evolution of the parties' distribution scheme.

| | Ordinary Distributions | Extraordinary Proceeds Distributions |
|---|---|---|
| 2011 LLC Agreement (JX-3) | Distributed based on Membership Interests (JX-3 § 7.01(a)(i)). | No exception for Extraordinary Proceeds. |
| 2014 LLC Agreement (JX-17) | Distributed based on Revised Sharing Percentages (JX-17 § 7.01(a)(ii)). | Distributed based on Membership Interests until $250 million threshold achieved.  After achieving threshold, distributed based on Revised Sharing Percentages (JX-17 § 7.01(a)(iii)). |
| 2016 LLC Agreement (JX-33) | Distributed based on Membership Interests until $190 million threshold achieved.  After achieving threshold, distributed based on Revised Sharing Percentages (LLC Agreement § 7.01(a)(ii)). | No exception for Extraordinary Proceeds. |

11

the Members in accordance with their respective revised sharing percentages as set forth on Exhibit A attached hereto.[41]

### 3.    The Deadlock Provision

The deadlock provision at the heart of this dispute is found in Article IV (governing "Board of Managers"), Section 4.10 (governing "Action by Vote") of the LLC Agreement.[42]

The Board structure established by the LLC Agreement had the effect of necessitating a unanimous vote of the Managers to authorize any Board action.[43] This unanimity requirement set up the potential for deadlock.

Section 4.10 provides a way out of a deadlock, although a radical one:  "[I]n the event the vote upon an action by the Board of Managers results in a deadlock, *then the Board of Managers shall dissolve the Company in accordance with Article*

---

[41] LLC Agreement § 7.01(a)(ii).  The 2016 LLC Agreement also revised the Membership Interests allocations in Exhibit A to list four Members of the Company:  Teller, with roughly 67.67% of the Membership Interests, Angry Elephant, with roughly 1.16% of the Membership Interests, the Teller Children's 2015 Trust, with 16% of the Membership Interests, and the Sanjiv Mehra 2014 Irrevocable Trust, with roughly 15.16% of the Membership Interests.  LLC Agreement Ex. A.  It also grouped the Members into "Jonathan Teller and Permitted Transferees," comprising the first three Members, and "Sanjiv Mehra and Permitted Transferees," comprising only the Sanjiv Mehra 2014 Irrevocable Trust.  *Id.*  Lastly, it changed the Revised Sharing Percentages to 50% for Teller and his entities, and 50% for Mehra's trust.  *Id.*

[42] LLC Agreement Art. IV; *id*. § 4.10.

[43] *See* LLC Agreement § 4.10; *see also* PTO ¶ 24 ("Mehra and Teller were the sole members of EOS Holdco's Board of Managers.").

*X*."[44]  Put differently, this clause—which this decision refers to as the "Deadlock Provision"—mandates ("shall") that dissolution follow from an event of deadlock.

Section 4.10 further dictates the procedure for Holdco's dissolution in the event of deadlock.  The relevant language is found in a proviso trailing the Deadlock Provision.  The parties agreed that Mehra and Teller would receive distributions of the Kind shares held by Holdco proportionate to their Holdco Membership Interests *and* that they would replicate the Equal-Distribution Arrangement at the Kind level.

In full, Section 4.10 provides:

> [I]n the event the vote upon an action by the Board of Managers results in a deadlock, then the Board of Managers shall dissolve the Company in accordance with Article X; provided that notwithstanding anything to the contrary contained herein, in connection with such dissolution, the membership interests of Kind [LLC] then held by the Company . . . shall be distributed to the Members pro rata in accordance with their respective Membership Interests and each of the Members shall take such actions as are necessary or appropriate to give effect as members of Kind to the economic arrangements among the Members set forth in Section 7.01(a)(ii) (i.e., it is the intent of the Members that, as between such Members, the same distribution provisions shall apply as Members of the Company or as members of Kind).[45]

---

[44] LLC Agreement § 4.10 (emphasis added).

[45] *Id.*

13

Section 4.10 was adopted as part of the 2014 LLC Agreement. EOS's outside counsel, Morrison Cohen LLP, drafted the 2014 LLC Agreement, and Teller and Mehra were involved in the process.

One aspect of the drafting history warrants mention. The parties specifically negotiated the last clause of Section 4.10 requiring that the Equal-Distribution Arrangement be replicated at the Kind level upon a deadlock-based dissolution. As discussed above, Mehra negotiated for the Equal-Distribution Arrangement as part of the 2014 LLC Agreement. Through the drafting process, the parties addressed the question of whether units of Kind would be distributed according to Membership Interests or according to the Revised Sharing Percentages.

The issue was first raised in a June 23, 2014 redline of the LLC Agreement prepared by Morrison Cohen attorneys in the form of a bracketed note at the end of the proposed text of Section 4.10:

> Each member of the Board of Managers shall be entitled to one (1) vote on each action submitted to the Board of Managers unless otherwise provided herein. Except as may be otherwise provided by law or this Agreement, when a quorum is present at any meeting, the vote . . . of all of the Managers shall be the act of the Board of Managers; provided, however, in the event the vote upon an action by the Board of Managers results in a deadlock, then the Board of Managers shall vote to dissolve the Company in accordance with Article X. *[discuss whether*

14

*preferred units would be distributed in accordance with revised sharing percentages.]*[46]

Mehra reviewed and commented on this draft and the proposed language of Section 4.10 specifically.[47] He proposed that the Kind stock be distributed according to the Revised Sharing Percentages, but that the parties escrow any Extraordinary Proceeds to ensure that they were distributed proportionate to Membership Interests until the aggregate distributions reached a threshold.[48] Teller agreed to this proposal without comment.[49]

A Morrison Cohen attorney responded to Mehra's comments by proposing an alternative designed to "[kick] the can down the road."[50] Rather than distribute Kind stock based on the Revised Sharing Percentages, the attorney suggested that the parties agree to replicate the Equal-Distribution Arrangement at the Kind level.[51] Teller forwarded the email suggesting this approach to Mehra with the note:

---

[46] *See* JX-11 § 4.10 (emphasis added).

[47] *See, e.g.*, JX-10 (emailing comments on drafts of the LLC Agreement between Teller, Mehra, and attorneys at Morrison Cohen), JX-12 (same), JX-14 (same).

[48] JX-11 (June 26, 2014 email from Mehra proposing language for the LLC Agreement that he believed would reflect "an agreement between Members that continues beyond the life of eos Holdings"); *id.* (Mehra proposing that "[o]n dissolution of eos Holdings, we distribute the Preferred Units (which is the only asset of the business) to members in the Sharing Ratio").

[49] JX-15.

[50] *Id.*

[51] *Id.*

"Thoughts?"[52] Mehra responded: "That's fine."[53] The parties thus reached an understanding reflected in the final language of Section 4.10 as follows: "[T]he Members shall take such actions as are necessary or appropriate to give effect as members of Kind to the economic arrangements among the Members set forth in Section 7.01(a)(ii) (i.e., it is the intent of the Members that, as between such Members, the same distribution provisions shall apply as Members of the Company or as Members of Kind)."[54]

### C. EOS's Financial Decline Strains the Parties' Relationship.

Prior to the disputed dissolution, Mehra and Teller were also the sole Managers of Kind in addition to being co-Managers of Holdco. Kind in turn was the sole Manager of Products. Mehra and Teller were also co-CEOs of Products. Although the parties held co-equal titles, Mehra made most of the business decisions, to which Teller generally deferred.[55]

The co-management arrangement worked well during the early years of Mehra's tenure when the Company experienced remarkable success. The Company

---

[52] *Id.*

[53] *Id.*

[54] LLC Agreement § 4.10.

[55] *See generally* PTO ¶¶ 24, 30, 32, 39; Trial Tr. at 412:15–16, 683:10–12, 685:17–18 (Teller); *id.* at 64:3–9, 385:23–386:8 (Mehra).

16

first turned a profit in 2011 and revenue doubled every year after,[56] hitting the high-water mark of about $182 million 2015.[57]

During these halcyon days, Mehra and Teller were a highly effective team. At work, they shared an office and "sat less than a foot and a half apart from each other during that time."[58] Outside of work, they were good friends. They shared meals.[59] Their families went on vacations together.[60] Teller knew Mehra's son well and would advise him on career and business decisions.[61] Teller's wife took Mehra's daughter shopping for prom dresses.[62] Teller made Mehra trustee of a Teller family trust that held 16% of Teller's interest in Holdco.[63]

---

[56] Trial Tr. at 25:12–15 (Mehra); *id.* at 407:2–4 (Teller).

[57] JX-169a at 6.

[58] Trial Tr. at 28:4–5 (Mehra); *see also id.* at 426:1–7 (Teller) (describing their working relationship as like "a married couple, in that we spent all this time together . . . he just feels more comfortable with me and is willing to let loose a little bit more").

[59] Trial Tr. at 34:4 (Mehra).

[60] *Id.* at 34:4–5 (Mehra).

[61] *Id.* at 34:5–34:20 (Mehra).

[62] *Id.* at 35:5–8 (Mehra).

[63] *Id.* at 35:11–24 (Mehra); LLC Agreement Ex. A.

Beginning in 2016, however, EOS's revenue began to decline precipitously, eventually reaching as low as $106 million in 2018.[64] By 2019, the Company had experienced four consecutive years of declining performance.[65]

The beginning of EOS's financial decline can be traced to a 2016 class-action lawsuit claiming that EOS's lip balm caused a rash,[66] but a series of business decisions that followed the lawsuit were contributing factors.[67] For example, the Company had expanded into international markets without a well-developed business plan,[68] and the international operations depleted the Company's cash

---

[64] JX-169a at 6. Periodic reports on the value of the Company prepared by an outside firm showed that the Company value reached a high of nearly $600 million in 2015 ($582,000,000) and then dropped to under $80 million ($76,900,000) in 2018, representing a loss in enterprise value of more than half a billion dollars in less than three years. *Compare* JX-20a at SM_QuickPeek_00774375 (valuing Kind as of April 30, 2015), *with* JX-169a at 2 (valuing Kind as of December 31, 2018). The valuation reports valued the Kind Group, whose "sole material asset" is a Class A Membership Interest in Products. JX-169a at 1, 48.

[65] *See* JX-169a at 16.

[66] *Id.* at 6; Trial Tr. at 61:12–62:1, 68:8–17 (Mehra).

[67] *See, e.g.*, Trial Tr. at 429:1–430:13 (Teller) (identifying problems in EOS's "top-line performance," "international businesses," and lack of innovation making the Company "a one-trick pony," in addition to the 2016 class action lawsuit).

[68] EOS established foreign operations in China, Hong Kong, Germany, Poland, Sweden, the United Kingdom, and Mexico. *See generally id.* at 69:24–71:12 (Mehra). The expansion plan was imperfect. The international operations lacked "formal business plans," and by 2017 the "numbers look[ed] terrible. . . . relative to their budgets and the expectations they had set" for the international business. *Id.* at 302:13–19, 306:8–10 (Mehra).

18

balances.[69] The Company lacked a line of credit, which could have helped it manage its cash flow issues.[70] The Company also launched a product, "Crystal," to help correct its image on the market after the lawsuit, but the launch was rushed and the product was unstable; the product ultimately created more problems than it solved.[71]

The Company then transitioned its supply chain to a small overseas manufacturer,

---

[69] EOS's international subsidiaries failed to produce necessary cash flow back to Products, which left that debt on EOS's books as unpaid receivables. *See* Landsberg Dep. Tr. at 82:4–13, 86:11–92:7. Products continued funding those businesses, resulting millions of dollars in losses for EOS by mid-2019. *See* JX-62 at SM_QuickPeek_00106125; Mehra Dep. Tr. at 275:23–276:8, 277:20–280:7, 281:15-283:3; Trial Tr. at 778:10–13 (Landsberg).

[70] The Company's depleted cash balances prompted Flavia Landsberg, who had joined EOS as CFO in February 2017, Trial Tr. at 776:24–777:6 (Landsberg), to recommend that the Company obtain a credit facility, *id.* at 778:2–779:4 (Landsberg). Mehra had Landsberg search for outside financing. Before leaving the Company in November 2018, *id.* at 804:19–21 (Landsberg), Landsberg negotiated a term sheet for a credit line from HSBC Bank USA, National Association ("HSBC"), *see* JX-81a; JX-92a; JX-93 Trial Tr. at 779:16–780:10 (Landsberg). Although most lenders required audited financials, Trial Tr. at 184:21–185:23 (Mehra), the HSBC term sheet would have allowed EOS access to cash based on an initial field exam of EOS's financials, JX-93; Trial Tr. at 193:21–194:6 (Mehra). After Landsberg's departure, Mehra took charge of EOS's finances. Trial Tr. at 875:12–13 (Pasqualini); Mehra Dep. Tr. at 182:14–183:1. In that role, Mehra did not complete the deal with HSBC or obtain audited financials to facilitate other financing options. *See* JX-105; Trial Tr. at 866:9–18 (Pasqualini). By September 2019, EOS still had not obtained a credit facility. *See* JX-158; JX-198 at 6; Trial Tr. at 197:14–16 (Mehra). Ultimately, Teller and Mehra personally loaned money to the Company to cover cash flow needs. Trial Tr. at 183:8–10 (Mehra).

[71] The Company launched the Crystal lip balm in 2017 in reaction to the negative publicity from the class action lawsuit. Trial Tr. at 82:2–83:5 (Mehra). As it turned out, the product suffered from significant stability and packaging issues—oils seeped out of its packaging, for example. *Id.* at 307:10–308:11 (Mehra). Crystal was the subject of about 90% of all customer complaints categorized as "'unusable product' tags" received by the Company in September 2018. JX-90 at SM_QuickPeek_00100976–78. Teller and Mehra agree that the product launch was a failure. Mehra Dep. Tr. at 303:2–303:16; Teller Dep. Tr. at 91:14–92:9.

19

which later proved incapable of handling EOS's business.[72]  As a result, EOS's relationship with its major customers became strained.[73]

EOS's financial decline also strained the parties' relationship, although not as early in the timeline as Teller claimed in this litigation.  With the benefit of hindsight, part of Teller's litigation strategy was to blame Mehra for all of the operational decisions that contributed to the Company's financial decline and to suggest that Teller was increasingly dissatisfied with Mehra as those decisions were being made.

---

[72] In late 2018, while managing EOS's supply chain, Mehra explored moving production of EOS's products to Absara, a manufacturer in Mexico.  Trial Tr. at 312:20–313:8 (Mehra); *id.* at 827:18–21 (Garg).  EOS transitioned to Absara in June 2019 and, within a month, experienced "issues filling orders" due to the poorly planned transition and to EOS's order projections that did not accurately reflect demand for its products.  *Id.* at 313:7–17 (Mehra); *id.* at 828:1–830:8 (Garg).  In May 2019, EOS hired a supply chain manager, Pankaj Garg.  *Id.* at 820:10–15 (Garg).  Garg testified that coordination problems and the Absara transition caused EOS to lose "maybe like 10 to $15 million in revenue because of Absara" in the third quarter of 2019.  *Id.* at 827:1–3 (Garg).  Also, Absara was a smaller manufacturer and lacked the financial resources required to take on the EOS business, necessitating "many prepayments for product."  *Id.* at 868:10–18 (Pasqualini); *id.* at 826:4–22 (Garg).  Absara's need for up-front cash and EOS's inaccurate demand projections yielded delays and supply shortages that impacted sales.  *Id.* at 827:5–12 (Garg); JX-180.  EOS's supply chain further suffered from high employee attrition—in one six-week period, half of EOS's supply chain employees left the Company.  Trial Tr. at 822:17–21 (Garg); *see* JX-156.

[73] *See, e.g.*, JX-121 (relaying Costco's complaints regarding Crystal); JX-216 at SM_QuickPeek_00314665–66 (describing cuts on orders and the impact it had on EOS's business relationships and credibility with customers); JX-165 (rationing product among customers due to insufficient supply); JX-701 (noting that supply chain failures had undermined EOS's credibility); *see also* Garg Dep. Tr. at 53:18–21, 55:12–14, 56:17–23 (testifying that Costco and Wal-Mart were two of EOS's larger customers and that there was a "big mismatch" between case-fill rate numbers reported by these customers and those used internally at EOS); Mehra Dep. Tr. at 336:16-337:2 (testifying as to a loss of about $400,000 worth of Costco orders in Aril 2019 due to issues with Absara).

But Mehra proved that Teller was highly deferential to Mehra's business decisions such that when the criticized decisions were made, Teller tacitly endorsed them. Mehra also demonstrated that Teller was the driving force behind some of the decisions Teller now criticizes.[74] Mehra further proved that other decisions seemed reasonable at the time even though they simply did not work out.[75] In the end, Teller's tacit endorsement of the business plan in real time makes many of his rationalizations in this litigation seem insincere.

Although aspects of Teller's litigation narrative are hard to believe, the record reflects that Teller did in fact begin to question Mehra's management decisions in the year leading up to the disputed dissolution. The timing of Teller's skepticism coincided with Mehra's decision to stop authorizing distributions to Holdco's Members.

---

[74] For example, Mehra explained at trial that Teller pushed for expansion into the Chinese market because he spoke Chinese, had conducted business there, and met his wife in China. Trial Tr. at 70:2 –71:24 (Mehra).

[75] For example, Mehra explained at trial that although Crystal was brought to market with some urgency, it "tested extraordinarily well," had been in development "for the past four or five years," and that Teller "agreed that it was the right thing to do." *Id.* at 82:7–83:20 (Mehra).

### 1. EOS Ceases Distributions to Teller.

From 2011 through 2018, Teller and his affiliated entities received nearly $100 million in distributions from EOS.[76] During trial, Teller tried to downplay the significance of the distributions by claiming that "most" of the money went to pay taxes, but this assertion was unsupported by the record.[77]

Mehra testified that Teller's desire for cash drove the timing and amounts of distributions.[78] Contemporaneous communications support this testimony. Emails around the time of certain distributions show Teller requesting cash to finance his personal needs.[79] Mehra testified that he disagreed with the wisdom of making the

---

[76] Trial Tr. at 552:11-553:16 (Teller); *see* JX-496 (showing W-2 income of $13.7 million to Teller); JX-510 (showing about $85.6 million in distributions to Teller, Angry Elephant, and the Teller Trust).

[77] Trial Tr. at 543:2–13 (Teller). Teller offered no documentary proof of how much tax he paid, *id.* at 544:12–549:6 (Teller), and the amounts distributed to Teller and his associated entities exceeded a rough-estimated tax rate of 50% of the attributed income. *See* JX-510.

[78] Trial Tr. at 37:10–38:6, 40:23–42:12 (Mehra).

[79] *See, e.g.*, JX-610 (Aug. 2013 email from Teller: "I will need to take $1 million near term"); JX-612 (Feb. 2014 email from Teller asking about "how much I can take out" to purchase a Park Avenue apartment); JX-613 (May 2014 email from Mehra authorizing a $4 million off-cycle bonus to Teller); JX-615 at SM_QuickPeek_00139776 (Feb. 2016 email from Teller: "I will need to take a distribution next week," "let's do this for $1 million"); JX-616 (Mar. 2016 email from Teller: "Could you please set up a wire to my personal account from eos Investor Holdings for $750,000?"); JX-617 (Apr. 2016 email from Teller: "Can you please set up a $600,000 transfer from . . . eos Investor Holdings to my personal account and characterize it as a distribution?"); JX-618 (May 2016 email from Teller: "Can you please set up a distribution for me for $800,000 to my personal account?"); *see also* JX-34a (listing 2016 distributions Teller took ahead of others); JX-38a (indicating that Teller took, in 2017, two $400,000 off-cycle bonuses and a $1.135 million salary advance). The two emails Defendants offered as evidence of Mehra requesting distributions, *see* Trial Tr. at 168:5–18, 351:11–352:3 (Mehra) (discussing JX-

distributions that Teller demanded,[80] but he accommodated his business partner's

(and friend's) desire for cash.[81]

While the business grew rapidly, Teller withdrew large sums to support his

lifestyle.[82] After sales declined and costs increased, Teller's distributions dropped.[83]

By 2018, distributions had ceased.[84] At the time, Teller received only approximately

$500,000 in salary.[85]

Although distributions had ceased, Teller's need for cash remained. From

2017 through 2019, Teller needed "somewhere between 2 and $2 ½ million" to

support his lifestyle, equivalent to $4 to $5 million in pre-tax income.[86] Teller's

---

6, JX-845), demonstrate that Mehra received a distribution proportionate to Teller and not that Mehra was the driving force behind the timing of the amount of the distributions. *See* JX-613; JX-625; Trial Tr. at 356:14–357:19 (Mehra).

[80] Trial Tr. at 37:10–38:6 (Mehra).

[81] *Id.* at 60:11–61:6 (Mehra). Plaintiffs say that the trial record does not contain every instance of Teller requesting or receiving cash ahead of other Members. That is quite possible. The Company refused to produce general ledger records, which would have told a more complete picture. *Id.* at 52:24–53:7 (Mehra). As Pasqualini testified, exporting the data would have been a straightforward task. *Id.* at 891:16–892:14 (Pasqualini). The snippets of Holdco's bank records defendants produced, JX-500, do not tell the whole story, *see supra* note 79. In any event, the weight of the existing evidence establishes that Teller's need for cash drove the timing and amount distributions. *Id.*

[82] *See* Pls.' Demonstrative 2; JX-496.

[83] Pls.' Demonstrative 4.

[84] Trial Tr. at 66:17–66:19 (Mehra).

[85] JX-496; JX-510.

[86] Trial Tr. at 567:19–568:16 (Teller); *see* JX-509 at 14.

$500,000 salary was a fraction of what he needed. As of September 30, 2018, Teller had less than $1 million in cash.[87]

### 2. Teller Becomes Critical of Mehra's Management of EOS.

After EOS stopped making distributions, Teller began to pay more attention to complaints about Mehra's management of EOS.

As Teller tells it, a number of employee complaints concerning Mehra came to his attention during the summer of 2019. Teller was overseas that summer temporarily directing European operations.[88] Teller contends that the European employees expressed concerns regarding Mehra's management and the weakness of the Company's supply chain.[89]

Also around that time, EOS's General Counsel and Head of Human Resources,[90] Sarah Slover, raised concerns about Mehra's management style, including feedback on the Glassdoor review site.[91] In her capacity as Head of Human Resources, Slover observed decreasing employee morale and increasing employee turnover.[92] She relayed those concerns to Teller.[93]

---

[87] JX-509 at 1.

[88] Trial Tr. at 440:19–22 (Teller).

[89] *Id.* at 442:7–443:24 (Teller).

[90] *Id.* at 438:11–15 (Teller); *id.* at 703:14–704:3 (Slover).

[91] *Id.* at 438:24–439:12 (Teller); *id.* at 709:16–710:14 (Slover).

[92] *Id.* at 704:6–705:21 (Slover).

[93] *Id.* at 438:16–439:12 (Teller).

Slover's report led Teller to investigate employee complaints throughout the summer of 2019.[94] He credibly testified at trial that his investigation made him increasingly concerned with Mehra's management style.[95] Testimony from EOS executives corroborated Teller's testimony.[96]

Mehra acknowledged that he "was a tough manager" who "held people accountable," but maintained that he "was also a very friendly person."[97] He lamented that the concerns over his management style were never brought to his attention.[98] This decision does not pass judgment on Mehra as a manager. For present purposes, the accusations are relevant only because they support Teller's testimony that he was growing increasingly dissatisfied with the shared-control arrangement.

### 3. Teller Explores Selling His Stake in Holdco.

With distributions still at a halt in the summer of 2019, Teller began exploring alternative paths to liquidity. One alternative was selling his Holdco stake.[99]

---

[94] *See id.* at 440:3–444:13 (Teller).

[95] *Id.* at 445:18–24 (Teller).

[96] *Id.* at 706:1–7, 708:16–709:5 (Slover); *id.* at 788:1–789:9 (Landsberg); *id.* at 822:15–823:11, 824:5–21 (Garg); *id.* at 877:10–17 (Pasqualini).

[97] *Id.* at 85:15–20 (Mehra).

[98] *Id.* at 86:6–9 (Mehra).

[99] *Id.* at 66:24–67:17 (Mehra); *id.* at 572:12–574:24 (Teller).

In July 2019, Teller contacted Olga Lewis, a Goldman Sachs investment banker, to explore that possibility.[100] Around that time, Teller told Mehra that he was considering selling his stake. During that conversation, Mehra suggested that Mehra owned 50% of Holdco.[101] This confused Teller, who sent Lewis the outdated 2014 LLC Agreement and sought advice as to whether Mehra actually owned 50% of the business.[102] Lewis apparently assured Teller that Mehra did not own 50%.[103]

Also in July 2019, Teller consulted with Morrison Cohen attorney Danielle Lesser about his rights under the various EOS operating agreements.[104] Teller offered to share Lesser's advice with Lewis,[105] though Lesser's advice was also based on the outdated 2014 LLC Agreement—she was unaware of the 2016 LLC Agreement until after September 26, 2019.[106]

Teller's communications with Lewis and Lesser around July 2019 reflect that Teller was basing his plans on the outdated 2014 LLC Agreement. As discussed above, that agreement distinguished between the distribution of ordinary proceeds

[100] JX-155; JX-154; Trial Tr. at 573:13–575:3 (Teller); Lewis Dep. Tr. at 14:19–15:9, 42:8–43:2; *see* JX-152.

[101] Teller Dep. Tr. at 263:8-20.

[102] *See* JX-152; JX152c.

[103] Teller Dep. Tr. at 263:21–264:5.

[104] JX-482.

[105] *See* JX-164 at EOS00005602.

[106] Lesser Dep. Tr. at 62:7–63:9.

(shared equally) and the distribution of "Extraordinary Proceeds" (shared about 85/15 in Teller's favor for the first $250 million). This structure gave Teller an incentive to dissolve Holdco so he could take 85% of the first $250 million (versus only 50% once the Threshold was reached under the 2016 LLC Agreement).[107]

On August 5, 2019, Mehra informed Teller that the Company's cash balance was "very low" and would "need a cash injection very soon."[108] That same month, Teller discussed his financial situation with his friend Stephen Cornick, a financial advisor.[109] In that conversation, Teller discussed a potential sale of his Membership Interests in EOS that he hoped would generate "some liquidity in his life."[110]

### 4. The Soap Project

Teller's growing concerns regarding Mehra bubbled over in September 2019 in the context of a dispute concerning a new soap product (the "Soap Project"). Mehra's son, Curan Mehra, brought the idea for the soap product to Mehra in April 2019.[111] Mehra liked the idea. It was a "high convenience, low cost, eco-friendly" product that would appeal to EOS's target consumers.[112] Mehra also

---

[107] *See* JX-17 § 7.01; Trial Tr. at 580:20–590:10 (Teller).

[108] JX-170; Teller Dep. Tr. at 200:5–201:24, 203:3-206:13.

[109] Cornick Dep. Tr. at 63:17–65:24; *see also id.* at 58:8–22.

[110] *Id.* at 63:17–65:24.

[111] Trial Tr. at 95:11–13 (Mehra).

[112] *Id.* at 96:20–22 (Mehra).

27

thought that it would help solve a few problems that EOS was facing. At the time, EOS was attempting to hire senior executive talent.[113] Mehra believed that the Soap Project could launch as a new brand, which EOS could spin-off in a few years.[114] He also believed that granting executives equity in the Soap Project would entice talent[115] and that a sale of the brand could help deliver liquidity to Teller.[116]

Mehra discussed the Soap Project with Teller in the spring of 2019.[117] Teller was initially receptive.[118] Mehra recalled Teller saying that the new brand might "play really well in Europe," that Teller was going to be making a trip to Europe, and that he intended to "poll [the EOS] staff in Europe to see what they thought about the idea."[119] In the late spring and through the summer of 2019, Mehra asked EOS employees, including its Chief Scientific Officer, Director of R&D, Chief Marketing Officer, and Vice President of Global Marketing and Innovation, to assist him with the Soap Project. Later in the summer, EOS marketing personnel assessed the competitive landscape of the product.[120]

---

[113] *Id.* at 97:3–21 (Mehra).

[114] *Id.* (Mehra).

[115] *Id.* at 97:12–16 (Mehra).

[116] *Id.* at 97:17–21 (Mehra).

[117] *Id.* at 97:22–98:8 (Mehra).

[118] *Id.* (Mehra).

[119] *Id.* at 98:3–8 (Mehra).

[120] *Id.* at 100:9–23 (Mehra); 666:6–11 (Teller).

Teller grew less enthusiastic about the Soap Project over the summer of 2019. At the time, one of the complaints that Teller was investigating concerned Mehra's misuse of EOS resources to promote Curan's business ventures.

Mehra had helped Curan form a consumer products company, Hayden Products, LLC ("Hayden"), to focus on oral care products in 2017.[121] Mehra funded Hayden through the same trust that held his interests in Holdco.[122] In Hayden's early stages, Mehra gave Curan access to the EOS office, where Curan used EOS resources and held the occasional meeting.[123] Through September 2019, EOS employees assisted Curan. They worked on Hayden's pitches to customers, attended pitch meetings, and helped Curan with the development, production, and marketing of Hayden products.[124] Mehra identified Hayden as a "sister company" to EOS and as "part of the same group as EOS" when obtaining credit references for Hayden.[125]

As Teller discovered the extent of Hayden's footprint at EOS, Teller grew increasingly concerned about the Soap Project.[126] He raised these concerns with

---

[121] *Id.* at 86:16–22, 87:10–21 (Mehra). This decision refers to Curan Mehra by his first name for clarity. The court intends no disrespect.

[122] *Id.* at 86:23–87:9 (Mehra).

[123] *Id.* at 88:9–24 (Mehra).

[124] The record contains numerous instances in which EOS employees worked on Hayden projects or assisted Mehra's son within the scope of their employment at EOS. *See, e.g.*, JX-148; JX-184; JX-197; JX-209; Slover 3/12/20 Dep. Tr. at 15:7-14, 32:11-12.

[125] Trial Tr. at 266:4–23 (Mehra); JX-173; JX-192.

[126] *See generally* Teller Dep. Tr. at 248:9–249:19, 276:4–278:6.

Mehra in August 2019, and Mehra and Teller discussed whether to pursue the Soap Project within EOS.[127] Mehra estimated that it would cost the Company between $5 million and $10 million to bring the product to market.[128] Mehra also stated that they would need to bring it to market quickly.[129]

In early September, Teller asked Mehra to put the Soap Project on hold until they could discuss it the following week.[130]

The following week, Teller emailed Mehra to ask that EOS not pursue the Soap Project.

On September 12, 2019, Teller wrote:

> I've been thinking about this and I'm uncomfortable doing [the Soap Project] as part of eos. I'd like to keep it separate. We can discuss more live. I have to head to East Hampton tomorrow morning but will be available on the phone or we can discuss Monday.[131]

On September 16, 2019, the parties met to discuss the Soap Project.[132] They agreed that Hayden would pursue the project after a transition period to phase the

---

[127] *Id.* at 249:20–2501:13, 252:16–20.

[128] *Id.* at 250:11–17.

[129] *Id.* at 251:9–13.

[130] *Id.* at 253:21–255:7..

[131] JX-222. They agreed to further discuss the Soap Project in person the following Monday, September 16, 2019. *See* JX-227.

[132] Trial Tr. at 103:1–104:8, 290:21–291:3 (Mehra).

project out of EOS.[133]   After the September 16 conversation, EOS employees continued to work on the Soap Project for a brief period.[134]  EOS's Chief Scientific Officer connected Mehra with suppliers for the Soap Project and attended a two-day trip to Chicago on September 24 and 25 with Mehra to meet with those suppliers.[135] The Soap Project transitioned from EOS to Hayden shortly after.[136]

### D.    Teller Decides to Cut Ties with Mehra.

In early September 2019, Teller decided to terminate the shared-control relationship by removing Mehra from EOS.  Teller cites the Soap Project as "the last straw."[137]  This aspect of Teller's testimony was credible.

On September 10, 2019—two days before he emailed his concerns to Mehra regarding the Soap Project—Teller, Slover, and Cornick met with Morrison Cohen attorneys Danielle Lesser and Jack Levy.[138]

---

[133] *Id.* at 104:1–104:15 (Mehra).  Slover disputes that Teller agreed to a transition period, but she was not present for Teller and Mehra's discussion.  Slover 3/12/20 Dep. Tr. at 36:7–37:23; Trial Tr. at 699:14–19 (Slover).

[134] Teller Dep. Tr. at 254:5–13; *see also* JX-229; JX-248; JX-247.

[135] Mehra Dep. Tr. at 153:20–154:11; *see also* JX-230.

[136] *See* JX-317.

[137] Trial Tr. at 466:1–467:23 (Teller); *see also* Teller Dep. Tr. at 276:6–279:2 (describing the purpose of a September 12, 2019, meeting with Morrison Cohen as a brainstorming session for how to approach the issue concerning Mehra and the Soap Project).

[138] Slover 3/12/20 Dep. Tr. at 27:22–29:4; Teller Dep. Tr. at 275:19–276:3.

According to Slover, the meeting was to discuss "the dispute that [Teller] was having with Sanjiv over the soap business."[139] But immediately after the meeting, Teller took the following steps, which suggest that the September 10 meeting marked the beginning of Teller's campaign to dissolve EOS:

- On September 11, Teller asked his cousin to replace Mehra as trustee for the Teller family trust holding 16% of Teller's interest in Holdco.[140]

- On September 12, Teller sent Mehra the email (block quoted above) asking that Mehra keep the Soap Project separate from EOS.

- On September 16, Teller hired a security firm to assist with "an employee we are planning to terminate."[141]

- On September 17, Teller hired a public strategy firm, Mercury Public Affairs LLC, to help control the narrative surrounding his plan to remove Mehra.[142]

- On September 19, the public strategy firm provided Teller with draft statements to employees to be issued upon Mehra's departure.[143] The firm prepared two drafts: one described Mehra as leaving voluntarily "to focus on other ventures;"[144] the other assumed that Mehra would not leave voluntarily and instructed that he no longer had authority to act on behalf of EOS.[145]

---

[139] Slover 3/12/20 Dep. Tr. at 29:16–20; Teller Dep. Tr. at 276:6–278:22.

[140] PTO ¶ 42; JX-503 at EOS00008400. Teller then executed the papers necessary to replace Mehra with his cousin on September 16, 2019; he did not inform Mehra. *See* JX-228. Mehra discovered the change after this litigation began. PTO ¶ 43.

[141] JX-240 at EOS00007351; *see* JX-240a.

[142] *See* JX-235; *see also* JX-505 at MOCORev_0001958.

[143] JX-252; JX-252a.

[144] JX-252a at EOS00005593.

[145] *Id.*

32

Also on September 19, Teller had a "[m]arathon session with the lawyers."[146] According to Teller, it was *then* that he had decided to remove Mehra from EOS.[147] This date seems specious given all that Teller had done to prepare for Mehra's removal prior to that meeting, but the timing of Teller's decision is inconsequential for the purpose of this decision. The relevant fact is that Teller had determined to remove Mehra.

Teller emerged from the September 19 lawyers meeting with a "game plan."[148] As Morrison Cohen attorneys advised Teller, the LLC Agreement required a 90% vote of the Members to remove a Manager,[149] and the only path to removing Mehra from Holdco management was a deadlock followed by a dissolution.[150]

Teller's game plan therefore required creating a deadlock at the Holdco Board. Upon dissolution, Teller would distribute Holdco's shares in Kind to the Holdco Members in proportion to their Membership Interests. The distribution would transfer voting power over Kind to Teller, which Teller could use remove Mehra from his management roles at Kind and Products.[151]

---

[146] JX-503 at EOS00008402.

[147] Teller Dep. Tr. at 316:9–13.

[148] JX-503 at EOS00008402).

[149] *See* LLC Agreement §§ 3.03, 4.01.

[150] *See id.* §§ 3.03, 4.01; *see also* JX-264 at EOS00012803.

[151] *See* Slover 6/5/20 Dep. Tr. 19:3–19:15, 49:18–50:2.

On September 23, 2019, Morrison Cohen attorney Jack Levy sent draft documents to Teller and Lesser, which Teller forwarded to Slover minutes later.[152] Levy's drafts included a proposed "resolution" of the Holdco Board to remove Mehra from all his positions at Holdco.[153]

There were a few problems with the initial version of the papers. Teller spotted the first: the drafts removed Mehra as co-CEO of Kind, where he was a Manager but not a CEO.[154] Levy spotted the second: the Board could not remove Mehra from his position as Manager of Holdco under Section 4.01 of the LLC Agreement.[155] After further email exchanges and calls between Teller, Slover, and Levy, they settled on a resolution that removed Mehra as Manager of Kind and reduced the size of the Kind Board.[156] Multiple statements in the email exchanges made clear that the goal was to "create deadlock."[157]

---

[152] JX-262, JXs-262a; JX-262b; JX-262c; JX-262d; JX262e; JX-262f; JX-262g.

[153] JX-262e.

[154] JX-264 at EOS00012804.

[155] JX-264 at EOS00012803 (Levy emailing Teller: "[w]e cannot remove Sanjiv as a Manager of EOS [Holdco]. . . . If Sanjiv is not Co-CEO of EOS then we need to figure out how to create the deadlock at the EOS level. Let me think about that").

[156] JX-268; JX-268a.

[157] JX-264 at EOS00012803 (Teller writing: "He is a manager of the other two entities. They wouldn't need CEO titles because they are holding companies. Why does this change *how we create deadlock*?") (emphasis added); JX-506 at EOS00012817 (Teller asking Slover: "Can I propose a resolution that changes the board of the Kind group and gives me control of the board and then that *creates deadlock*?" (emphasis added)).

After the form of the resolution was resolved, Levy emailed Teller the revised documents necessary to effectuate the dissolution (the "Dissolution Materials").[158] The chronology of execution would have Teller: (1) notice a Board meeting at the Holdco level; (2) propose a resolution removing Mehra, which would result in a deadlock; (3) dissolve Holdco; (4) distribute Holdco's assets consisting of Membership Interests in Kind; (5) execute a written consent as Kind's now-majority Member to remove Mehra as a Manager and reduce Kind's board to one Manager (Teller); (6) notify Kind Members of this action; and (7) execute a written consent as Kind's now-sole Manager to remove Mehra from his role as co-CEO of Products.

Also on September 23, Lesser sent Teller a preparatory cheat sheet to guide him through the Board meeting and deadlock process.[159] The document included a script for conducting a Board of Managers meeting, guidance on how to answer questions or objections Mehra may pose, and statements indicating that Teller need not provide Mehra a meeting agenda and may count Mehra's abstention as a "no" vote.[160]

---

[158] JX-274. The Dissolution Materials comprised: (1) a notice of meeting of the Holdco Board of Managers; (2) a resolution at the Holdco level to remove Mehra as a Manager of Kind; (3) an Holdco notice of dissolution; (4) an assignment of Holdco's interests in Kind to each Holdco member; (5) a written consent of the Kind Members removing Mehra as Manager; (6) a notice to Kind Members of that action; and (7) a written consent of Kind's sole Manager removing Mehra as co-CEO and employee of Products. *Id.*

[159] *See* JX-276; JX-276a.

[160] JX-276a.

That night, Teller followed up with a technical question about whether he needed Mehra to waive notice of the Board meeting.[161] Levy responded that he "would rather have the email [waiving notice] especially if [Mehra] walks out/hangs up when he hears what the meeting is about."[162] Slover's solution was to "reiterate as we open the meeting that he has waived notice and I can record that as part of the minutes."[163]

On September 24, 2019, Teller noticed a meeting of the Holdco Board.[164] Before this notice, neither Mehra nor Teller had raised business issues for a vote by the Board of any of the EOS entities.[165] The notice did not identify the purpose of the meeting.[166] Mehra viewed the notice as unusual and emailed himself a copy of the LLC Agreement as well as the operating agreement for Kind.[167]

The notice set the meeting for September 25, 2019.[168] Teller subsequently agreed to move the meeting to September 26 because Mehra was in Chicago

---

[161] JX-279 at EOS00012794–95.

[162] *Id.* at EOS00012794.

[163] *Id.* This was not an issue—the LLC Agreement requires notice by email 24 hours in advance of a meeting, which Teller provided. *See* LLC Agreement § 4.08.

[164] PTO ¶ 44; JX-283.

[165] PTO ¶ 39.

[166] *See* JX-283 (September 24, 2019 notice of meeting of Board of Managers to be held on September 25, 2019); JX-284 (agreement to move meeting to September 26); LLC Agreement § 4.08.

[167] PTO ¶ 45; Trial Tr. at 113:3–14 (Mehra).

[168] JX-283.

attending meetings for the Soap Project.[169]  On September 25, Slover emailed Teller unsigned execution versions of the Dissolution Materials.[170]

To Teller, the outcome of the meeting was pre-ordained.  The events leading up to the meeting—replacing Mehra as trustee, hiring the public strategy firm, hiring the security guards, receiving the talking points, and obtaining and executing the Dissolution Materials—made clear that Teller viewed the outcome as a *fait accompli*.[171]

### E.    The September 26, 2019 Board Meeting

The Board Meeting occurred on September 26, 2019 (the "September 26 Meeting").[172]   Both Teller and Mehra made audio recordings of the meeting.[173] Slover attended the meeting as corporate secretary of EOS Holdco.[174]

At first, Teller stuck to his script as best he could.  He began with a roll call, announcing that "[t]here is a quorum."[175]  He notified Mehra that he was presenting "a resolution upon which we will then vote."[176]  He next informed Mehra that a

---

[169] JX-284; *see* Trial Tr. at 284:7–14 (Mehra).

[170] JX-288; *see* JX-288a; JX-288b; JX-288c; JX-288d; JX-288e; JX-288f; JX-288g; JX-288h.

[171] JX-290; JX-291.

[172] PTO ¶ 46.

[173] *Id.*

[174] *Id.* ¶ 47.

[175] JX-300-PT at 3:20–21.

[176] *Id.* at 3:22–23.

"failure to vote for any reason will be considered a vote against the proposal."[177] He then stated that "[t]he purpose of this meeting is to authorize the company to execute consent as a member of the Kind Group, LLC, to remove Sanjiv Mehra as a member of the Kind Group, LLC."[178] This last statement was wrong, of course. As discussed above, the resolution that Teller and the lawyers conceived was to remove Mehra as a Manager of Kind. Aside from this error, the statements all came from the script Lesser provided to Teller on September 23, 2019.[179] Teller offered Mehra a copy of the resolution, which Mehra declined to read.

Mehra then forced Teller off script by requesting "a rationale for what you are doing."[180] Teller stated his reasons as follows:

> I don't believe that you should be a CEO of the company anymore. I don't like your influence in the company. I don't . . . like the way you . . . worked with me. I think you've been a very negative force in this organization. You've created a toxic culture. You are dishonest. . . . no one can talk to you. You are very difficult to work with. . . . I'm thinking of the best interests of the company. And I think your continued presence as part of management is adversely affecting the continued viability of the organization.[181]

---

[177] *Id.* at 3:24–4:2.

[178] *Id.* at 4:3–4:8.

[179] *See* JX-276a.

[180] JX-300-PT at 4:15–16.

[181] *Id.* at 4:17–5:12.

38

Before Mehra could respond, Teller noted that "it seems like we have a difference of opinion here."[182] Teller then declined Mehra's request to repeat his rationale and called for a vote.[183]

Mehra did not vote. He instead proposed "a second resolution . . . that Jonathan Teller be removed from every aspect of The Kind Group, EOS Products, for the fact that he is completely incompetent to actually manage the business."[184]

From this point on, the meeting descended into displays of personal animus.[185] Mehra accused Teller of wrongdoing and continued to refuse to vote on Teller's resolution.[186] Neither resolution passed, and Teller declared a deadlock.[187]

## F. Efforts to Dissolve Holdco

After declaring deadlock, Teller proceeded to inform Mehra that Holdco would be dissolved.[188] As a Manager of Holdco, Teller executed a notice of dissolution. Teller also executed four "Assignments" distributing Holdco's Membership Interests in the Kind Group to Holdco Members proportionate to their

---

[182] *Id.* at 5:13–15.

[183] *Id.* at 6:1–8.

[184] *Id.* at 6:9–15; *see also id.* at 6:16–7:11 (Mehra's statements in support of his counter-resolution).

[185] *See id.* at 7:17–18:8.

[186] *Id.* at 7:20–24; *id.* at 9:2–7; *id.* at 15:12–19.

[187] *Id.* at 8:15–16 (declaring "[w]e are deadlocked").

[188] *Id.* at 9:22–10:7.

Membership Interests as required by Section 4.10 of the LLC Agreement.[189] Teller did not take any action to replicate the Equal-Distribution Arrangement at Kind.

At the September 26 Meeting, Teller notified Mehra that he had been removed from all EOS management positions and asked him to leave the EOS offices.[190] Mehra refused to leave, causing Teller to call in the security guard to escort Mehra from the office.[191] Mehra again refused to leave, prompting the security guard to call the New York City police.[192] Eventually, two police officers arrived. Mehra put some papers into a banker's box and left the building.[193] Mehra testified that, had he been given a choice and some time to consider it, he may have agreed to step down.[194]

### G. This Litigation

The plaintiffs are Samrita Mehra as the trustee of the Sanjiv Mehra 2014 Irrevocable Trust, which holds Mehra's Membership Interests in the Company, and Mehra (together, "Plaintiffs").[195] Plaintiffs filed this action on October 10, 2019,[196]

---

[189] JX-291 at EOS00000494–97.

[190] JX-300-PT at 10:11–11:21.

[191] *Id.*

[192] JX-300-PT at 13:22–14:6.

[193] Trial Tr. at 132:10–133:4 (Mehra).

[194] *Id.* at 141:16–142:2, 144:1–4 (Mehra).

[195] *See id.* ¶¶ 16–17.

[196] Dkt. 1, Verified Compl. for Breach of Fiduciary Duty and Breach of Contract.

and amended their complaint on December 13, 2019.[197]  The Amended Complaint

names five defendants:  Teller; Holdco; Angry Elephant; Teller's cousin and trustee

of the trust holding a portion of Teller's Membership Interests in the Company,

Andrew Saltoun; and Slover (collectively, "Defendants").

The Amended Complaint asserts four causes of action:  Count I against Teller

for breach of fiduciary duty;[198] Count II against Teller for breach of the LLC

Agreement;[199] Count III against Slover for aiding and abetting Teller's breach of

fiduciary duty;[200] and Count IV for a declaratory judgment invalidating the

dissolution of Holdco and enforcing Mehra's economic rights under the LLC

Agreement.[201]

A portion of the relief Mehra sought arguably implicated Kind, a New York

entity.  In light of the jurisdictional concerns raised by Kind's involvement and to

facilitate prompt relief, the court bifurcated the issues in this case.[202]  By letter

decision dated December 9, 2019, the court limited the scope of the expedited trial

to whether there is a basis for invalidating the dissolution of Holdco.[203]

---

[197] Dkt. 58, Verified Am. Compl. ("Am. Compl.").

[198] *Id.* ¶¶ 80–83.

[199] *Id.* ¶¶ 85–89.

[200] *Id.* ¶¶ 91–96.

[201] *Id.* ¶¶ 99–101.

[202] Dkt. 52, Letter Decision at 1–2.

[203] *Id.* at 2.

Trial took place over three days in late July 2020.[204] The parties completed post-trial briefing on September 25, 2020,[205] and the court heard post-trial oral argument on October 1, 2020.[206] This decision focuses solely on the narrow issue of Holdco's dissolution, leaving open Mehra's other claims and any remedies Mehra seeks outside of invalidating the dissolution.

## II. LEGAL ANALYSIS

Plaintiffs assert two claims challenging the dissolution. Plaintiffs first claim that Teller breached the LLC Agreement when effecting the dissolution. Next, they claim that Teller breached his fiduciary duties when effecting the dissolution.

### A. Breach of the LLC Agreement

Plaintiffs claim that Teller breached the LLC Agreement in three ways. First, Teller breached Section 4.10 by declaring a deadlock. Second, Teller breached Section 4.03 by failing to act in good faith and to protect and promote the interests of the Members. Third, Teller breached Section 4.10 by dissolving Holdco unilaterally.

---

[204] *See* Trial Tr.

[205] *See* Dkt. 196, Pls.' Post-Tr. Opening Br. ("Pls.' Opening Br."); Dkt. 205, Defs. Jonathan Teller, EOS Investor Holding Company, LLC, and Angry Elephant Capital, LLC's Answering Post-Tr. Br. ("Defs.' Answering Br."); Dkt. 209, Pls.' Post-Tr. Reply Br. ("Pls.' Reply Br.").

[206] Dkt. 217, October 1, 2020 Post-Tr. Oral Arg. ("Oral Arg. Tr.").

The Delaware Revised Limited Liability Company Act (the "LLC Act") grants members of an LLC "the statutory freedom . . . to shape, by contract, their own approach to common business relationship problems."[207] In resolving governance disputes in the LLC context, the court first looks to the rights and obligations as set forth in "the parties' bargained-for operating agreement."[208] Delaware courts interpret LLC agreements like other contracts—objectively, giving "priority to the parties' intentions as reflected in the four corners of the agreement, construing the agreement as a whole and giving effect to all its provisions."[209] "Under standard rules of contract interpretation, a court must determine the intent of the parties from the language of the contract."[210] In so doing, the court looks to "context [as] the primary determinant of meaning, and . . . the structure and relationship of the parts of a contract" as indicative of "the drafters' intent."[211]

---

[207] *Haley v. Talcott*, 864 A.2d 86, 88 (Del. Ch. 2004) (internal quotation marks omitted).

[208] *Franco v. Avalon Freight Servs. LLC*, 2020 WL 7230804, at *2 (Del. Ch. Dec. 8, 2020) ("In governance disputes among constituencies in an LLC, the starting (and end) point almost always is the parties' bargained-for operating agreement. . . .") (quoting *A&J Cap., Inc. v. L. Off. of Krug*, 2018 WL 3471562, at *5 (Del. Ch. July 18, 2018)).

[209] *Salamone v. Gorman*, 106 A.3d 354, 368 (Del. 2014) (internal quotation marks omitted).

[210] *Twin City Fire Ins. Co. v. Del. Racing Ass'n*, 840 A.2d 624, 628 (Del. 2003) (citing *Kaiser Aluminum Corp. v. Matheson*, 681 A.2d 392, 395 (Del. 1996)).

[211] *JJS, Ltd. v. Steelpoint CP Hldgs., LLC*, 2019 WL 5092896, at *6 (Del. Ch. Oct. 11, 2019) (describing the "whole-text canon" of contract interpretation).

## 1.     Breach of Section 4.10's Deadlock Provision

Under the Deadlock Provision, "in the event the vote upon an action by the Board of Managers results in a deadlock, then the Board of Managers shall dissolve the Company."[212]   Plaintiffs' first theory of breach is that Teller violated the Deadlock Provision by manufacturing a deadlock when none existed.

The LLC Agreement does not define "deadlock."  It is appropriate, therefore, to turn to statutory definitions and decisions of this court defining "deadlock" when interpreting judicial dissolution provisions in the LLC Act, the Delaware Revised Limited Partnership Act (the "LP Act"), and the Delaware General Corporation Law (the "DGCL").[213]

---

[212] LLC Agreement § 4.10.

[213] *See* 6 *Del. C.* § 18-802 ("On application by or for a member or manager the Court of Chancery may decree dissolution of a limited liability company whenever it is not reasonably practicable to carry on the business in conformity with a limited liability company agreement."); 6 *Del. C.* § 17-802 ("On application by or for a partner the Court of Chancery may decree dissolution of a limited partnership whenever it is not reasonably practicable to carry on the business in conformity with the partnership agreement."); 8 *Del. C.* § 273(a) ("If the stockholders of a corporation of this State, having only 2 stockholders each of which own 50% of the stock therein, shall be engaged in the prosecution of a joint venture and if such stockholders shall be unable to agree upon the desirability of discontinuing such joint venture . . . either stockholder may . . . file with the Court of Chancery a petition stating that it desires to discontinue such joint venture . . . or that . . . the corporation be dissolved."); 8 *Del. C.* § 226(a)(2) (providing for judicial appointment of custodians and receivers when "the directors are so divided respecting the management of the affairs of the corporation that the required vote for action by the board of directors cannot be obtained and the stockholders are unable to terminate this division"); *see also*, *Obeid v. Hogan*, 2016 WL 3356851, at *6 (Del. Ch. June 10, 2016) ("The choices that the drafters make have consequences. . . .  Depending on the terms of the agreement, analogies to other legal relationships may . . . be informative." (citing *JAKKS Pac., Inc. v. THQ/JAKKS Pac., LLC*, 2009 WL 1228706, at *2 (Del. Ch. May 6, 2009))); *Vila v.*

44

When applied to a vote of a board, "deadlock" means a failure to meet a voting threshold.[214] Depending on the applicable voting standard, a failure to meet a voting threshold can result from the presence of negative votes or the lack of affirmative votes.[215]

---

*BVWebTies LLC*, 2010 WL 3866098, at *7 & n.49 (Del. Ch. Oct. 1, 2010) (looking to Section 273 of the DGCL by analogy in resolving claims for judicial dissolution of LLCs and collecting authorities on Section 273 dissolution).

Defendants deny that it is appropriate to look to judicial precedent when interpreting the meaning of "deadlock" under Section 4.10. They argue that "Section 4.10 is clear that deadlock under the [LLC Agreement] occurs as a result of the vote of the Board of Managers on *one* action. The [LLC Agreement] does not require anything more . . . ." Defs.' Answering Br. at 30–31; *see also* Oral Arg. Tr. at 41–42 (citing cases, including *Murfey v. WHC Ventures, LLC*, 236 A.3d 337 (Del. 2020)). As support, Defendants draw from the Delaware Supreme Court's decision in *Murfey*, where the court declined to impose the common law "necessary and essential" requirement to an inspection provision in an LLC agreement that expressly permitted inspection of certain categories of documents, including the K-1s at issue. 236 A.3d at 346–58. *Murfey* is not instructive here. In *Murfey*, the court cautioned against applying common law precedent to impose conditions that did not appear on the face of the contract. In this case, common law precedent is helpful to understanding the meaning of a word appearing on the face of the contract—"deadlock."

[214] *Meyer Nat. Foods LLC v. Duff*, 2015 WL 3746283, at *3 (Del. Ch. June 4, 2015) (defining deadlock as an "inability to make decisions and take action, such as when an LLC agreement requires an unattainable voting threshold"); *see also*, 2 David A. Drexler et al., *Delaware Corporation Law and Practice* § 30.01, at 30-1 (2020) (defining deadlock as "the inability of the directors or stockholders to function effectively because of dissension among evenly divided interests."); Donald J. Wolfe, Jr. & Michael A. Pittenger, *Corporate and Commercial Practice in the Delaware Court of Chancery* § 9.10[c][3], at 9-256 (2020) ("[T]he deadlock must stem from the inability of the board to muster sufficient votes to take curative action due to the division of opinion."); *Deadlock*, Black's Law Dictionary (11th ed. 2019) (defining "deadlock" generally as "[a] state of inaction resulting from opposition, a lack of compromise or resolution, or a failure of election").

[215] *See Licht v. Storage Tech. Corp.*, 2005 WL 1252355, at *1 (Del. Ch. May 6, 2005) (affirming the "widely-accepted notion" that "abstentions are in effect negative votes" (citing Drexler, *Delaware Corporation Law and Practice* § 25.06, at 25-10)); *In re Del Monte Foods Co. S'holders Litig.*, 2011 WL 2535256, at *6 (Del. Ch. June 27, 2011)

A deadlock must also be genuine for it to have legal effect. As Chancellor Bouchard explained in *In re Shawe & Elting, LLC*, a deadlock must be a product of genuine, good faith divisions.[216] A genuine deadlock does not exist where it is "based upon a specious premise" or "one side sought to manufacture it 'by refusing to consider any issue.'"[217] Delaware courts have denied petitions for judicial intervention where the respondent has shown that "the [constituent] seeking intervention has done so in bad faith by manufacturing a deadlock."[218] "[T]he bad faith defense . . . seeks to demonstrate that a director or stockholder has

---

(holding in the context of stockholder votes under 8 *Del. C.* § 251(b) that "not voting is the same as voting against" a corporate action); *see also Smith v. Sussex Cnty. Council*, 632 A.2d 1387, 1388–89, 1392 (Del. Ch. 1993) (deciding that an abstention does not count as a "concurrence by acquiescence" in the context of a municipal city council vote where "[n]o action . . . shall be valid or binding unless adopted with the concurrence of a majority of all members of the county government," concluding that "the Council as a body acts through its votes; its members concur in decisions by voting"); *id.* ("When [the law] requires the concurrence of all members, it requires, in my opinion, a majority of all members to vote affirmatively.").

[216] 2015 WL 4874733, at *28 (Del. Ch. Aug. 13, 2015) (holding that a deadlock must "reflect genuine, good faith divisions . . . of a fundamental and systemic nature over how the Company should be managed"); *see also Kleinberg v. Cohen*, 2017 WL 568342, at *11 (Del. Ch. Feb. 13, 2017) (same).

[217] *Kleinberg*, 2017 WL 568342, at *11 (quoting *Francotyp-Postalia AG & Co. v. On Target Tech., Inc.*, 1998 WL 928382, at *4 (Del. Ch. Dec. 24, 1998) and *Millien v. Popescu*, 2014 WL 656651, at *2 n.17 (Del. Ch. Feb. 19, 2014)).

[218] Brian C. Durkin, *Manufactured Deadlocks? The Problematic "Bad Faith Defense" to Forced-Sales of Delaware Corporations Under Section 226 of the Delaware General Corporation Law*, 59 B.C. L. Rev. 725, 729 (2018).

manufactured a 'phony' deadlock or has sought to give the appearance of a deadlock by refusing to agree to any business decisions . . . ."[219]

Not all deadlocks justify dissolution, as courts will seldom find that deadlock over an insignificant business decision warrants terminating the entity. For a deadlocked decision to justify judicial dissolution, the decision at issue must be qualitatively significant. Delaware business statutes capture this qualitative requirement in various ways. Relevant here, the LLC Act provides for judicial dissolution "whenever it is not reasonably practicable to carry on the business."[220] "[S]erious managerial issues," such as strategic visions, major initiatives, and the operation and control of a company, will typically satisfy the qualitative requirements imposed by statute and common law.[221] And the question of who

---

[219] *Id.* (citing *Millien*, 2014 WL 656651, at *2 n.17, and *Vila*, 2010 WL 3866098, at *7).

[220] 6 *Del. C.* § 18-802; *see also* 6 *Del. C.* § 17-802 (providing for the dissolution of a limited partnership "whenever it is not reasonably practicable to carry on the business"); 8 *Del. C.* § 273(a) (providing for dissolution of corporate joint ventures if the "stockholders shall be unable to agree upon the desirability of discontinuing such joint venture"); 8 *Del. C.* § 226(a)(2) (providing for appointment of a custodian where a corporation's "directors are so divided respecting the management of the affairs of the corporation that the required vote for action by the board of directors cannot be obtained"); *Deadlock*, Black's Law Dictionary (11th ed. 2019) (explaining that deadlock arises from "[t]he blocking of corporate action by one or more factions of shareholders or directors who disagree about a *significant aspect of corporate policy*" (emphasis added)).

[221] *Vila*, 2010 WL 3866098, at *7; *see also Shawe*, 2015 WL 4874733, at *26–28 (finding deadlock over issues including distributions to members, pursuit of acquisitions, expense true-ups to reconcile personal uses of company funds, and the hiring and retention of personnel).

should run a company is the quintessential serious managerial issue.[222]

In this case, Defendants argue that language of Section 4.10 stands unqualified and does not impose any qualitative requirement on the deadlocked decision at issue. Section 4.10 does not require that the deadlock make it impracticable to "carry on the business," for example. Still, the nature of the decision at issue informs whether the deadlock is genuine, and the court evaluates the significance of the decision at issue for that purpose.

Adapting the above principles to the circumstances of this case, Teller's resolution at the September 26 Meeting resulted in "deadlock" for the purposes of the Deadlock Provision if: (a) the Board failed to achieve the necessary voting threshold on a Board action; and (b) the Board deadlock was genuine.

### a. The Board failed to achieve the voting threshold on a Board action.

At the September 26 Meeting, Teller verbally proposed a resolution to authorize the company to execute a consent as a Member of the Kind Group to remove Mehra as a Manager of the Kind Group.[223] Teller voted in favor of the

---

[222] *See, e.g., Klaassen v. Allegro Dev. Corp.*, 2013 WL 5967028, at *15 (Del. Ch. Nov. 7, 2013) ("Often it is said that a board's most important task is to hire, monitor, and fire the CEO.").

[223] JX-300-PT at 4:3–8. As discussed above, Teller misstated the nature of the resolution during the meeting, proposing that the Board remove Mehra as a "member of the Kind Group, LLC." *Id.* The decision does not hold Teller to his misstatement, and treats the proposal as one to remove Mehra as a "Manager" of Kind consistent with the written resolution that Teller offered Mehra.

48

resolution.[224] Mehra did not vote on the resolution.[225] The proposed Board action, therefore, failed to achieve the voting threshold necessary to carry a Board action.

This conclusion should be uncontroversial, but Plaintiffs dispute it nonetheless. They argue that Mehra's refusal to vote should *not* be treated as a vote against the resolution.[226] As discussed above, however, abstentions can have the same effect as a "no" vote depending on the voting standard.[227] In this case, the quorum requirement in the LLC Agreement necessitated the presence of both Managers; Board action thus required unanimity.[228] Where unanimity is the voting threshold, either an abstention or a "no" vote can defeat it. Thus, the court treats Mehra's abstention as a "no" vote, meaning that the Teller proposal failed to achieve the voting threshold.[229]

In a second and somewhat novel attack on the voting threshold issue, Plaintiffs argue that there was no failure to meet a voting threshold "*by the Board*" as required

---

[224] *Id.* at 8:2–3.

[225] *Id.* at 8:5–14.

[226] Pls.' Opening Br. at 46.

[227] *See supra* note 215 and accompanying text.

[228] LLC Agreement § 4.09.

[229] Mehra also argues that there was no vote because the proposal was brought on by "surprise," *see* Pls.' Opening Br. at 1, 46, but that argument speaks more to the genuine nature of the deadlock discussed *infra* Section II.A.1.b and Mehra's claim for breach of fiduciary duties discussed *infra* Section II.B.

49

by Section 4.10 because it was not within the Board's power to take action on the proposed resolution.

Plaintiffs point to Section 3.03 of the LLC Agreement, which provides that "[w]henever . . . approval or consent is required to be given by the Company, by vote or otherwise, it shall be authorized upon receiving the affirmative vote of the Members holding not less than 90% of the Membership Interests."[230] Plaintiffs argue that the resolution sought to cause Holdco to provide consent and thus required approval by *Members* under Section 3.03. Because the Board was categorically foreclosed from acting on Teller's proposal under Plaintiffs' interpretation of Section 3.03, they contend that that the Board vote cannot give rise to the relevant deadlock. Any deadlock on the decision must be construed as a deadlock among Members and not Managers as required by the Deadlock Provision.

Plaintiffs' argument based on Section 3.03 fails in the finer details. Article III of the LLC Agreement establishes requirements for action by Members. Properly read, Section 3.03 imposes a super-majority voting requirement (90%) on actions to be taken by Members. It does not require that Members vote as Members on every Company action. Such an interpretation would run contrary to Article IV, Section 4.04 of the LLC Agreement. As discussed above, Article IV governs actions

---

[230] LLC Agreement § 3.03.

by the Board of Managers. Section 4.02 authorizes the Board to "carry out the conduct of the Company's business."[231] Section 4.04 of the LLC Agreement thus allows the Board to authorize and execute written consents by the Company, which Teller's resolution sought to do. Mehra's abstention on that resolution therefore gave rise to deadlocked vote on a Board action.

### b. The deadlock was genuine, even though the circumstances forcing the moment of deadlock were contrived.

The more nettlesome issue raised by the deadlock analysis is determining whether the deadlock was genuine. This decision finds that Teller and Mehra expressed a fundamental and irreconcilable disagreement as to who should run EOS, and that disagreement was sufficient to support a finding of deadlock and justify dissolution.[232] The proposal at issue was in effect a referendum of Mehra's management of EOS. This sort of decision is the quintessential "serious managerial issue" that speaks to the practicality of carrying on the business and rises to the level of significance to support a finding that deadlock was genuine.[233]

This finding is reached with some reservation because Plaintiffs' arguments to the contrary are well-founded. Plaintiffs contend that Teller was motivated by a

---

[231] *Id.* § 4.02.

[232] *See* JX-300-PT (expressing disagreement and animosity while clashing over competing resolutions to remove each other as Managers of Kind and a co-CEOs of Products).

[233] *See supra* notes 221–22 and accompanying text.

51

need for liquidity as of September 2019 and sought to dissolve the Company to further this purpose, that the events giving rise to the deadlock were contrived, and that most of the justifications proffered for Teller's desire to end the shared-control relationship were pretextual. Based on the trial record, most of these contentions seem true.

It is true that Teller was motivated by a need for liquidity as of September 2019. Teller's repeated requests to withdraw money from the Company show that EOS served as the primary source of income funding his lifestyle.[234] Around the time EOS faced liquidity concerns, Teller turned to his financial advisor to explore a possible sale of his stake in the Company.[235] He even told Cornick that he needed "some liquidity in his life."[236]

Yet, Teller's desire for liquidity was not the driving force behind Teller's decision to oust Mehra. An internal Goldman Sachs email shows that Teller understood that he could not sell the Company for at least another twelve months.[237]

---

[234] *See* Trial Tr. at 45:24–46:7, 47:14–19 (Mehra) (testifying about Teller's requests for distributions to fund real estate purchases in Manhattan and in the Hamptons).

[235] *See* JX-154 (noting on July 19, 2019 that EOS's "majority shareholder reached out; starting to consider a transaction again"); JX-155 (documenting a July 18, 2019 call between Teller and Olga Lewis at Goldman Sachs to "discuss his desire for exit").

[236] Cornick Dep. Tr. at 65:7–8.

[237] JX-155 ("Call with Jonathan to discuss his desire for exit, *likely 12-18 months from now*. . . . He understand [sic] he needs to show growth to attract interest.") (emphasis added).

And this decision finds that concerns with Mehra that developed over the summer of 2019 discussed more fully below were Teller's dominant reasons for removing Mehra.

It is also true that the events giving rise to the Board's deadlock were contrived and the outcome of the September 26 Meeting was pre-ordained. Teller wanted Mehra out of EOS and took concrete steps to accomplish that goal. He and Slover met with Morrison Cohen attorneys,[238] devised a game plan,[239] followed a script designed to "create deadlock,"[240] and pre-executed documents in contemplation of that result.[241] Teller even hired an armed guard to ensure the meeting would end with Mehra's removal and retained a public relations firm to shape the narrative.[242]

---

[238] Teller Dep. Tr. at 275:24–276:3; JX-503 at page 20 (message EOS00008402).

[239] *See, e.g.,* JX-264 at EOS00012803 (emailing on September 23, 2019, to discuss strategy for how to best accomplish Mehra's removal, noting that Teller intends to "create deadlock"); JX-506 at message EOS00012817 (messaging Slover to inquire about a resolution that would give Teller "control of the board" and "create[] deadlock").

[240] *See* JX-264 at EOS00012803; JX-276a.

[241] JX-262 (sending Teller draft Dissolution Materials); JX-274 (sending Teller finalized Dissolution Materials); JX-288 (sending Teller execution versions of the Dissolution Materials); JX-290 (acknowledging on September 25, 2019, that Teller will be "bringing signed originals" to the meeting); JX-291 (compiling executed Dissolution Materials).

[242] JX-240a (hiring an armed security agent for September 26, 2019); JX-505 (confirming "a deal for one month" of public relations work on September 18, 2019); JX-252 (providing Teller with draft press releases characterizing Mehra's departure).

A contrived procedure designed to force deadlock could cast doubt on the earnestness of the parties' disagreement.[243] Board meetings are intended as times to deliberate, to convince Board members of ideas and positions, and to debate the merits of business decisions and business risks. When the result is pre-ordained, the process becomes artificial. Where there are no sincere efforts to resolve a deadlock, there is reason to doubt that the deadlock itself is genuine.[244]

Yet, the focus of the court's factfinding on deadlock issues is to determine whether there is a genuine, irreconcilable disagreement between the parties. Here, there is. In this case, the deadlocked parties had worked closely together for many

---

[243] *See, e.g.*, *Millien*, 2014 WL 656651, at *2 n.17 (denying reconsideration of the court's appointment of a custodian because testimony at trial suggested that any deadlock was contrived by the petitioner's refusal "to consider any issue"); *Bentas v. Haseotes*, 1999 WL 1022112, at *3–5 (Del. Ch. Nov. 5, 1999) (declining to appoint a custodian under 8 *Del. C.* § 226 where the reason for a purportedly deadlocked director election was stockholders' refusal to attend meetings resulting in a failure to reach quorum; ordering a stockholder meeting under 8 *Del. C.* § 211 instead to ensure quorum and avoid a contrived deadlock).

[244] Plaintiffs go further to say that "the plain meaning of 'deadlock' contemplates process and efforts to resolve," and the pre-meditated nature of the deadlock renders it disingenuous. Pls.' Reply Br. at 6 (citing Merriam-Webster's Collegiate Dictionary (11th ed.); The New Int'l Webster's Collegiate Dictionary of the Eng. Language (2002 ed.)). They are incorrect in this interpretation—that the deadlock was pre-meditated does not make it disingenuous, and Plaintiffs erroneously derive their definition from dictionaries rather than the ample authority of this court interpreting "deadlock." Neither of the definitions on which they rely require process or efforts to resolve a disagreement, in any event. Plaintiffs read too much into those dictionary definitions. The first dictionary source defines "deadlock" as "a state of inaction or neutralization resulting from the opposition of equally powerful uncompromising persons or factions." Merriam-Webster's Collegiate Dictionary (11th ed.). The second defines "deadlock" as "[a] cessation of activity or progress caused by the refusal of opposing parties to cooperate." The New Int'l Webster's Collegiate Dictionary of the Eng. Language (2002 ed.).

years, and one of them had grown exceedingly distrustful of the other's management decisions. In such circumstances, it is easy to conclude that the disagreement over whether to continue the shared-control arrangement arose in good faith, even if the context within which they formally deadlocked was clearly contrived.[245]

Finally, it is true that Teller's litigation position overstated the degree to which Mehra's business decisions influenced Teller's determination to cut ties. Teller made it seem like he was growing increasingly frustrated with Mehra from 2014 through the September 26 Meeting.[246] That testimony was insincere, and Mehra proved that Teller tacitly endorsed business plans and decisions as Mehra made them.[247]

---

[245] *See, e.g., Shawe*, 2015 WL 4874733, at *28 (holding that a deadlock must "reflect genuine, good faith divisions . . . of a fundamental and systemic nature over how the Company should be managed"); Durkin*, supra* note 218 at 729 ("[T]he bad faith defense . . . seeks to demonstrate that a director or stockholder has manufactured a 'phony' deadlock or has sought to give the appearance of a deadlock by refusing to agree to any business decisions . . . ."); *see also Fisk Ventures, LLC v. Segal*, 2009 WL 73957, at *4–7 (Del. Ch. Jan. 13, 2009) (finding that deadlock warranted dissolution despite a party's refusal to exercise a contractual option that could break the deadlock, noting that the parties could not "harmoniously resolve their differences" and that "dissolution becomes the only remedy available" where "deadlock cannot be remedied through a legal mechanism set forth within the four corners of the operating agreement").

[246] *See, e.g.,* Trial Tr. at 421:9–425:12 (Teller) (hinting at tension underlying their working relationship due to Mehra's "temper" and desire to "take more and more control").

[247] *See, e.g.,* JX-71 (capitulating to Mehra's request to "hold on these discussions until we've had a more full discussion internally"); JX-170 (notifying Teller that financing "will take 3 months" and "[w]e may get lucky but don't plan on anything earlier"); Trial Tr. at 70:23 –71:9 (Mehra) (testifying that Teller drove the decision to expand EOS's business into China); *id.* at 847:17–848:13 (Garg) (testifying that the transition to Absara was Mehra's decision but that Teller was aware of the decision and raised no objections); *id.* at

55

Yet, the record reflects that Teller's primary gripe with Mehra was not pretextual. Teller and Mehra harbored an irreconcilable disagreement as to who should run the Company. This disagreement was on vivid display during the September 26 Meeting. The audio recording of the September 26 Meeting captures Teller's resolute belief that Mehra should no longer run EOS and Mehra's equally adamant belief that Teller was not qualified to take his place.[248] Teller expressed his opinion that Mehra was "a very negative force in this organization," "created a toxic culture," and that Mehra's "continued presence as part of management is adversely affecting the continued viability of the organization."[249] Mehra responded by accusing Teller of being "completely incompetent" with "absolutely no understanding of the economics of the business," and of "bankrupt[ing] the

---

83:6–84:5 (Mehra) (testifying that Teller participated in daily discussions about the Crystal launch); *id.* at 85:2–20, 86:6–12 (Mehra) (testifying that Teller never confronted him about his management style even after the two discussed being tougher on employees); *id.* at 89:1–90:7 (Mehra) (testifying that Teller was aware of Hayden and advised Curan on some Hayden matters); *id.* at 99:20–100:1 (Mehra) (testifying that Teller did not ask Mehra to stop working on the Soap Project within EOS until September 16, 2019); *id.* at 104:1–19 (Mehra) (testifying that Teller agreed to a transition period during which Mehra would transfer the Soap Project from EOS to Hayden after September 16, 2019).

[248] JX-300-PT at 6:1–15.

[249] *Id.* at 4:17–5:12.

business" through his distributions.[250]  An insurmountable chasm existed between Teller and Mehra by the time the meeting concluded.[251]

This finding is supported by evidence of growing discord between Teller and Mehra immediately preceding the September 26 Meeting.  Of Teller's many criticisms of Mehra raised in this litigation, contemporaneous communications and third-party testimony corroborate two.

First, Teller testified genuinely about his growing concern over Mehra's impact on the Company culture and the resulting employee attrition.  To recap, Teller learned of the problem from Slover and from disgruntled employees in Europe.  He spoke to EOS executives over the summer of 2019.[252]  Teller stated that these conversations gave him the sense that the way Mehra interacted with employees "was having a negative influence on both the culture and just the way the business . . . was operating."[253]  These concerns are reflected in Teller's

---

[250] *Id.* at 6:9–7:11.

[251] For example, seven lines of the meeting transcript comprise a back-and-forth between Teller and Mehra repeating "[n]o, you don't" and "[y]es, I do" at one another until interrupted by Teller's security agent.  *Id.* at 12:20 –13:3.

[252] Trial Tr. at 442:19–24, 444:5–13 (Teller); *see also id.* at 440:3–444:13 (Teller) (detailing his efforts to corroborate the information he obtained from Slover about Mehra's treatment of employees).

[253] *Id.* at 445:21–24 (Teller).

communications from the summer of 2019.[254]  Teller's testimony is corroborated by the testimony of EOS executives.[255]

Second, Teller testified genuinely as to real-time concerns regarding the Soap Project.  Teller was sensitive to Mehra's use of Company resources to aid Curan.  He was exceptionally frustrated by Mehra's pursuit of the Soap Project with Curan.  Teller's testimony is corroborated by the testimony of EOS executives.[256]

At least as to these two topics, Teller and Mehra fundamentally disagreed.[257]  This, coupled with the parties' conduct during the September 26 Meeting, provides a sufficient basis on which to conclude that the deadlock was genuine.

---

[254] *See* JX-138 (June 3, 2019 email from Garg indicating the "[t]hird Monday third resignation" of an employee); JX-175 (August 8, 2019 email from Teller attributing comments about "serious turnover" and "low employee morale" to "Glassdoor").

[255] *See id.* at 439:5–12 (Teller); *id.* at 706:1–7, 708:16–709:5 (Slover); *id.* at 788:1–789:9 (Landsberg); *id.* at 822:15–823:11, 824:5–21 (Garg); *id.* at 877:10–17 (Pasqualini).

[256] *Id.* at 699:20–700:20, 702:12–703:13 (Slover); *id.* at 832:20–836:18 (Garg).

[257] Plaintiffs' other attack on the *bona fides* of the deadlock do not alter this conclusion. Plaintiffs acknowledge the import of disagreements over the "question of who should run the company," but they argue that this question pertained to Products such that there was no disagreement as to who should run *Holdco*. Pls.' Opening Br. at 44. This argument ignores the reality of EOS's business structure and falsely assumes that Mehra compartmentalized his efforts to manage Holdco from his efforts to manage EOS's subsidiaries. That is not the case. The parties treated EOS as a single operation and managed it accordingly. The Board action to remove Mehra as a Manager of Kind was a surrogate vote to remove Mehra from his management roles at EOS generally.

## 2. Breach of Section 4.03's Requirements to Act in Good Faith and Protect and Promote the Members' Interests

Plaintiffs next claim that the dissolution should be rendered invalid due to Teller's breach of Section 4.03 of the LLC Agreement, which required him to act "in good faith" and to "protect and promote the interests of the Company and the Members."[258] This argument can be broken down into two parts. First, Mehra repackages his argument that Teller failed to act in good faith by manufacturing the deadlock. Second, Mehra contends that Teller failed to protect and promote Plaintiffs' interests by discontinuing their shared-control relationship of the EOS entities.

The Delaware Supreme Court has held that contractual good faith is a subjective standard applied at the time the decision was made.[259] The standard is "purely subjective" and Section 4.03 is upheld if Teller "in good faith determined" that Mehra's removal was in the Company's best interest and that his secrecy

---

[258] *See* Pls.' Opening Br. at 48–49; LLC Agreement § 4.03.

[259] *See DV Realty Advisors LLC v. Policemen's Annuity and Ben. Fund of Chicago*, 75 A.3d 101, 109–11 (Del. 2013); *see also ev3, Inc. v. Lesh*, 114 A.3d 527, 539 (Del. 2014) (applying the *DV Realty* standard to analysis of contractual good faith in failing to make milestone payments pursuant to a merger agreement, noting that "[a] plaintiff contending that a party did not comply with its express contractual duty of good faith would typically have to show that the party acted in *subjective* bad faith."); *Allen v. Encore Energy P'rs., L.P.*, 72 A.3d 93, 105–06 (Del. 2013) (holding that where a limited partnership agreement imposed "a contractual duty of subjective good faith," a plaintiff must show conscious disregard of that contractual duty "to form a subjective belief," which "would take an extraordinary set of facts").

furthered the Company's best interest.[260] The court need not rehash determinations reached in prior sections of this decision. Though Teller's testimony lacked credibility at times, he believably testified that he fundamentally disagreed with how Mehra ran the business.

As for the clandestine manner in which Teller accomplished this goal, Teller testified as to his belief that any transparency about his intentions would have been counterproductive. Specifically, Teller felt that "asking him to leave would have not been very productive, and it would have caused . . . obvious dissent in the organization, which would have had a negative effect on the employees. And I was concerned that . . . there would be this period of limbo . . . where people weren't sure who do I report to and this company is chaotic and I need to leave."[261] Teller based his belief on Mehra's "temperament" and on his "experience with [Mehra]."[262] The court finds that Teller's assertion was genuine—Teller honestly believed that alerting Mehra to his intentions prior to the meeting would have been counterproductive.

Plaintiffs spend much of their post-trial reply brief attacking Teller's credibility on several critical topics, including Teller's "hope" that Mehra would

---

[260] *DV Realty*, 75 A.3d at 111.

[261] Trial Tr. at 520:4–15 (Teller).

[262] *Id.* at 520:4–5 (Teller).

60

agree to step down, Teller's purported confusion over the mechanics of the dissolution, and each of the business disputes put forth by Teller in this litigation.[263] As to those topics, the court shares Plaintiffs suspicions. But, as explained above, Teller credibly testified as to his decision to remove Mehra and as to his reasons for not approaching Mehra in advance of the September 26 Meeting. Those issues remain dispositive as to the validity of the dissolution.

Plaintiffs also point to Teller's liquidity motive as indicative of bad faith.[264] As explained in the previous section, the evidence is insufficient to conclude that liquidity was the driving force behind Teller's actions or that Teller's decision to remove Mehra was made in bad faith.

Plaintiffs next argue that Teller breached Section 4.03 by failing to "protect and promote" their interests "in maintaining the protections and rights in EOS Holdco's Operating Agreement."[265] The interests to which Plaintiffs cite are "the Mehra Trust's effective veto power over actions subject to the vote of EOS Holdco's members . . . and its interest in having Mehra remain on the Board."[266] The breach

---

[263] Pls.' Reply Br. at 14–17.

[264] *Id.* at 18–20. Later, Plaintiffs claim that Teller's motivation "was to dissolve Holdco." *Id.* at 21. But the only implication or explanation offered for this motive is Teller's ability to benefit financially from the outcome. As noted above, the evidence simply does not demonstrate that this was Teller's driving motivation.

[265] Pls.' Opening Br. at 49.

[266] Pls.' Reply Br. at 21.

they assert is Teller's act of dissolving the Company, which eliminated those rights.[267]

Plaintiffs' "preserve and protect" argument conflicts with the parties' contractual scheme. Essentially, Plaintiffs contend that Teller had an obligation to preserve and protect Mehra's shared-control rights in all circumstances, even in the event of deadlock. Put differently, Plaintiffs argue that Teller was required to continue working in a shared-control relationship with Mehra in perpetuity. This interpretation would render the Deadlock Provision meaningless by permanently foreclosing any dissolution that would eliminate the shared-control arrangement. Plaintiffs' interpretation must be rejected for that reason.[268]

To recap, because Teller acted with the honest belief that his conduct was necessary for the Company, he did not breach the Section 4.03 requirement that the Board of Managers act in good faith. And the protect-and-promote requirement was not a till-death-do-us-part commitment; it did not require Teller to remain in a shared-control relationship with Mehra in perpetuity. Plaintiffs' arguments therefore do not warrant invalidating the dissolution of Holdco.

---

[267] *Id.*

[268] *Osborn v. Kemp*, 991 A.2d 1153, 1159 (Del. 2010) (holding that courts must "read a contract as a whole and . . . give each provision and term effect, so as not to render any part of the contract mere surplusage") (quoting *Kuhn Const., Inc. v. Diamond State Port Corp.*, 990 A.2d 393, 396–97 (Del. 2010)); *Shall*, Black's Law Dictionary (11th ed. 2019) (defining "shall" as "is required to," noting that it connotes "the mandatory sense that drafters typically intend and that courts typically uphold").

### 3. Breach of Section 4.10's Dissolution Requirements

Plaintiffs' final theory of contractual breach is that Teller violated Section 4.10's requirements for a deadlock-based dissolution. Plaintiffs first claim that Teller breached Section 4.10 by unilaterally effecting the dissolution and distributing Company assets.[269] Plaintiffs next claim that Teller breached Section 4.10's requirement to give effect to the Company's economic sharing arrangements at the Kind level.[270] Once again, Plaintiffs argue that these breaches warrant invalidation of the dissolution.[271]

### a. Teller did not breach the LLC Agreement by acting unilaterally to effect the dissolution.

The Deadlock Provision of Section 4.10 provides that "in the event the vote upon action by the Board of Managers results in a deadlock, then the *Board of Managers* shall dissolve the Company in accordance with Article X."[272] Plaintiffs interpret this language as requiring that the Board—meaning both Managers and not an individual Manager—effect the dissolution. Plaintiffs also argue that this language incorporates by reference Article X of the LLC Agreement, which requires that the Board appoint a "liquidator (who may be a Member)" to "liquidate the assets

---

[269] Pls.' Opening Br. at 50–51.

[270] *Id.* at 52.

[271] *Id.* at 49–50.

[272] LLC Agreement § 4.10 (emphasis added).

of the Company, apply and distribute the proceeds . . . as contemplated by this [LLC Agreement]."[273] Plaintiffs claim that the dissolution violated these provisions because Teller, and not the Board, unilaterally executed the Notice of Dissolution and liquidated the assets.

It is easy to reject Plaintiffs' interpretation of Section 4.10, which would essentially require a unanimous Board vote from a deadlocked Board to effect dissolution. The premise of Plaintiffs' argument is that because the *Board* must take action to dissolve the Company under Section 4.10, *Teller* could not effectuate dissolution without Mehra's authorization. Put differently, Plaintiffs argue that Mehra holds veto rights over the Board's compliance with Section 4.10. Taken to its logical extreme, Plaintiffs' argument results in the nonsensical possibility that a Board deadlock—which "*shall*" trigger dissolution under Section 4.10—does not result in dissolution if the Board fails to authorize dissolution. To avoid the perpetual loop of deadlocked Board decisions, and to render the mandatory language of Section 4.10 effective as this court must,[274] dissolution must flow automatically from an event of deadlock without any intervening Board action.[275]

---

[273] *Id.* § 10.02.

[274] *See supra* note 268 and accompanying text.

[275] Plaintiffs' interpretation seems unlikely to result in an invalidation of the dissolution in any event. At a minimum, the perpetual deadlock loop created by Plaintiffs' reading would support a holding that it is not reasonably practicable to carry on the business so as to justify judicial dissolution under the LLC Act. *See* 6 *Del. C.* § 18-802.

Section 10.01 of the LLC Agreement bolsters the conclusion that Section 4.10 requires automatic dissolution upon an event of deadlock. Section 10.01 states that such "[d]issolution of the Company shall be effective *on the day the event occurs giving rise to the dissolution.*"[276] As specified by Section 4.10, a deadlocked Board vote is an event giving rise to dissolution under the LLC Agreement. Thus, under Section 10.01, dissolution was required to occur on the day of the event of deadlock, timing that leaves little room for intervening Board action.[277]

For these reasons, Teller did not breach Section 4.10 by unilaterally authorizing dissolution.

Plaintiffs' argument based on Section 10.02's requirement that the Board appoint a liquidator fares no better. Once again, the premise of Plaintiffs' argument is that intervening Board action is required to implement aspects of Section 4.10, which runs contrary to the mandatory nature of Section 4.10 and would undermine the effectiveness of the Deadlock Provision.

---

[276] LLC Agreement § 10.01 (emphasis added).

[277] The drafting history of Section 4.10 provides additional support for the notion that the parties intended for dissolution to follow automatically from an event of deadlock. An early draft of the 2014 amendment to the LLC Agreement provided that in the event of a deadlock, "the Board of Managers *shall vote to* dissolve the Company." JX-11 § 4.10 (emphasis added). The final version of Section 4.10 omits this language and requires only that in the event of a deadlock "the Board of Managers *shall dissolve* the Company." LLC Agreement § 4.10 (emphasis added). In so doing, the LLC Agreement contemplates dissolution as the mandatory consequence of a deadlock.

Plaintiffs' argument based on Section 10.02 fails for other reasons as well. It is true that dissolution under Section 4.10 is subject to Article X, which governs dissolution generally. But a *deadlock-based* dissolution is governed by specific provisions of Section 4.10. And here the specific terms of Section 4.10 prevail over the general terms of Article X.[278] Section 4.10 requires distribution of the Membership Interests in Kind:

> [I]n connection with such dissolution, *the membership interests of Kind then held by the Company, as well as any other Company assets . . . , shall be distributed to the Members pro rata in accordance with their respective Membership Interests . . . .*[279]

That requirement applies "notwithstanding anything to the contrary contained herein."[280] The requirement is purely formulaic, which cuts against the notion that the parties intended that a liquidator be appointed to implement it. It is simply not reasonable to interpret Section 4.10 as requiring the appointment of a liquidator, as Plaintiffs argue. It is unclear why the appointment of a liquidator would make a difference given the formulaic nature of Section 4.10 in any event.

---

[278] *See, e.g., DCV Hldgs., Inc. v. ConAgra, Inc.*, 889 A.2d 954, 961 (Del. 2005) ("Specific language in a contract controls over general language, and where specific and general provisions conflict, the specific provision ordinarily qualifies the meaning of the general one." (citing *Katell v. Morgan Stanley Gp., Inc.*, 1993 WL 205033, at *4 (Del. Ch. June 8, 1993))).

[279] LLC Agreement § 4.10 (emphasis added).

[280] *Id.*

In sum, in response to a deadlock, the Company "shall" be dissolved. Teller was therefore empowered to give effect to that dissolution and to liquidate the Company's assets notwithstanding the Deadlock Provision's reference to Board action or any requirement that the Board appoint a liquidator.

> **b.      Teller breached the LLC Agreement by failing to give effect to the economic arrangements among the Members at the Kind level.**

Plaintiffs' final argument for invalidating the dissolution under the LLC Agreement is based on the remaining language of Section 4.10, which states:

> [I]n connection with such dissolution . . . each of the Members shall take such actions as are necessary or appropriate *to give effect as members of Kind to the economic arrangements* among the Members *set forth in Section 7.01(a)(ii)* (i.e., it is the intent of the Members that, as between such Members, the same distribution provisions shall apply as Members of the Company or as members of Kind).[281]

As discussed above, Section 7.01(a)(ii) requires that distributions are made proportionate to the Membership Interests (approximately 85%/15%) until aggregate distributions equal the threshold.[282]  Once the threshold is achieved, distributions are to be made according to the Revised Sharing Percentages (50%/50%).  Plaintiffs contend that Teller failed to give effect to the Company's

---

[281] *Id.* (emphasis added).

[282] *Id.* § 7.01(a)(ii).

economic arrangement at Kind when dissolving EOS Holdco. This, according to Plaintiffs, puts Teller in ongoing breach of Section 4.10.[283]

This argument has merit. Teller acknowledges his duty under Section 4.10 to give effect to the distribution provisions of Holdco after dissolution.[284] He further admits that he took no action to implement Plaintiffs' economic rights at Kind.[285]

Although Plaintiffs' argument has merit, it does not speak to the immediate question before the court—whether there was a basis to dissolve Holdco. Plaintiffs do not argue that this breach, standing alone, warrants invalidation of the dissolution. Nor could they. Replicating the Company's distribution provisions at Kind is an obligation "in connection with" and not a condition precedent to the dissolution.[286]

As noted above, the court bifurcated proceedings to address the narrow question of the validity of Holdco's dissolution. This decision therefore does not address other remedies for Teller's failure to replicate the Equal-Distribution

---

[283] Pls.' Opening Br. at 52.

[284] Trial Tr. at 508:3 –11,

[285] *Id.* at 508:12 –509:7, 511:10 –14, 514:17–24 (Teller). Teller attributes his failure to abide by the requirements of Section 4.10 to Mehra filing this lawsuit, but that does not make sense given that Mehra sued Teller in part for his failure to abide by Section 4.10. Trial Tr. at 515:16–516:8, 662:5–9 (Teller); *see also* Defs.' Answering Br. at 40 ("When the parties resolve the economic aspect of this dispute, any funds owed from the Company to the Mehra trust in order to effectuate the economic arrangements will be paid.").

[286] *See* LLC Agreement § 4.10.

Arrangement at Kind. For now, it suffices to say that this breach does not invalidate the dissolution of Holdco.

## B. Breach of Fiduciary Duties

Plaintiffs' final argument asks the court to invalidate the dissolution on equitable grounds.[287] They contend that Teller manufactured the deadlock as part of an illicit scheme to strip Mehra of his economic rights in EOS.[288] This, according to Plaintiffs, violated Teller's fiduciary duty of loyalty and justifies invalidating the dissolution.[289]

By default, limited liability company managers owe fiduciary duties akin to those owed by directors of a corporation.[290] Although Delaware law permits a limited liability company to eliminate fiduciary duties in the governing agreement,[291] the LLC Agreement does not do so.

Teller owed the Company and its Members a duty of loyalty, which "mandates that the best interest" of the Company and its owners "takes precedence over any

---

[287] Pls.' Opening Br. at 53.

[288] *Id.* at 53–61.

[289] *Id.* at 62–63.

[290] 6 *Del. C.* § 18-1104 ("In any case not provided for in this chapter, the rules of law and equity, including the rules of law and equity relating to fiduciary duties . . . shall govern.").

[291] 6 *Del. C.* § 18-1101(e) ("A limited liability company agreement may provide for the limitation or elimination of any and all liabilities for breach of contract and breach of duties (including fiduciary duties) of a member, manager or other person to a limited liability company or to another member or manager or to another person that is a party to or is otherwise bound by a limited liability company agreement . . . .").

69

interest" he may have possessed personally.[292]  "[B]ad faith conduct is a breach of the duty of loyalty. . . ."[293]  Under Delaware law, a plaintiff can show bad faith by proving that a fiduciary "intentionally acts with a purpose other than that of advancing the best interests of the corporation," intentionally "acts with the intent to violate applicable positive law," or "intentionally fails to act in the face of a known duty to act, demonstrating a conscious disregard for his duties."[294]

Plaintiffs assert several variations on their duty of loyalty claim, but the unifying theme of these claims is that Teller breached his duty of loyalty by acting to further his own desire for control over EOS's cash flows.[295]  The court has rejected Plaintiffs' theory that Teller was motivated to remove Mehra solely by a desire for liquidity multiple times in this decision.  The court has also found that Teller acted in good faith, both in terms of deciding to remove Mehra and in doing so without first confronting him.

Relevant to the narrow question addressed in this trial, Plaintiffs contend that Teller's actions warrant equitable invalidation of the dissolution because Mehra

---

[292] *See Triple H Fam. Ltd. P'rship v. Neal*, 2018 WL 3650242, at *18 (Del. Ch. July 31, 2018) (quoting *Cede & Co. v. Technicolor, Inc.*, 634 A.2d 345, 361 (Del. 1993)).

[293] *See, e.g.*, *Stewart v. BF Bolthouse Holdco, LLC*, 2013 WL 5210220, at *11 (Del. Ch. Aug. 30, 2013) ("It is now well-established . . . that the duty of loyalty encompasses more than interested transactions and also covers director actions taken in bad faith.").

[294] *In re Walt Disney Co. Deriv. Litig.*, 906 A.2d 27, 67 (Del. 2006).

[295] *See, e.g.,* Pls.' Opening Br. at 57–58 (arguing that Teller was motivated by a need for liquidity and that he sought to gain control over the Company to benefit from its sale).

"was ambushed and ejected from the premises," and therefore "was not given the opportunity to consider his options."[296] According to Plaintiffs, the Board's actions at the September 26 Meeting were void, even if all of the steps taken in advance of and during that meeting complied with the LLC Agreement and LLC Act.

Plaintiffs rely on two decisions in which this court invalidated actions taken at a board meeting—*VGS, Inc. v. Castiel* and *Alderstein v. Wertheimer*[297]—but these decisions are inapposite.

In *VGS, Inc. v. Castiel*, this court declared invalid a merger orchestrated by two managers without notice to a third manager who could have used his majority stake to prevent the merger.[298] The LLC had three members and a three-person board of managers. Two of the members were entities controlled by the founder, which collectively designated one manager, and which held a majority of the membership interests.[299] The other member was an entity controlled by an investor, which designated one manager.[300] The third manager was independent from the members.

---

[296] *Id.* at 60.

[297] *Id.* (citing *Alderstein v. Wertheimer*, 2002 WL 205684, at *9–11 (Del. Ch. Jan. 25, 2002) and *VGS, Inc. v. Castiel*, 2000 WL 1277372, at *4 (Del. Ch. Aug. 31, 2000)).

[298] 2000 WL 1277372, at *4–5.

[299] *Id.* at *1.

[300] *Id.*

After some time, the founder and the investor "had very different ideas about how the LLC should be managed and operated."[301] The investor successfully convinced the third-party manager to merge the LLC into a Delaware corporation without notice to the founder.[302] They did so by written consent of a two-thirds majority of the board, an action that the founder could have prevented had he been informed in advance. The court held that this secret merger violated the managers' duty of loyalty to the LLC and its majority member.[303] Central to the court's analysis was the structure of the LLC agreement, through which the majority stockholder "protected his equity interest in the LLC through the mechanism of appointment to the board rather than by the statutorily sanctioned mechanism of approval by members owning a majority of the LLC's equity interests."[304] The court noted that the defendants "knew that with notice [the third manager] could have acted to protect his majority interest" and that they therefore "breached their duty of loyalty to the original member and their fellow manager by failing to act in good faith."[305] For that reason, the court declared the merger invalid.

---

[301] *Id.* at *2.

[302] *Id.*

[303] *Id.* at *5.

[304] *Id.*

[305] *Id.* at *4.

72

In *Alderstein v. Wertheimer*, this court invalidated a stock issuance planned without notice to a controlling stockholder.[306] The company at issue in *Alderstein* struggled financially due to a series of managerial problems that ultimately resulted in its insolvency.[307] In anticipation of a board meeting, one director proposed terms for an acquisition of the company but did not disclose those plans to the company's founder and controlling stockholder.[308] Upon learning of this plan at the board meeting, the founder objected to its dilution of his voting control, despite the company's "immediate need of funds."[309] After the board voted to approve the transaction and to remove the founder from the board, the founder voted his majority shares to remove other directors from the board by written consent.[310] He then filed a suit seeking to invalidate the actions of the board meeting and to reinstate his majority control, retroactively giving effect to his written consent.[311]

After concluding that the board meeting complied with the requirements of the DGCL and the company's bylaws, the court framed the question as "whether [the plaintiff] had an adequate opportunity to protect his interests."[312] The court

---

[306] 2002 WL 205684, at *9–11.

[307] *Id.* at *1–5.

[308] *Id.* at *6.

[309] *Id.* at *7.

[310] *Id.*

[311] *Id.*

[312] *Id.* at *10.

reasoned that "the decision to keep [the plaintiff] in the dark about the plan . . . was significant because [he] possessed the contractual power to prevent the issuance."[313] Although the plaintiff "may or may not have exercised this power had he been told about the plan in advance," the court deemed invalidation of the issuance proper because "he was fully entitled to the opportunity to [protect himself] and the machinations of those individuals who deprived him of this opportunity were unfair and cannot be countenanced by this court."[314] Despite the directors' good-faith desire to save the company, the court would not allow them "accomplish such action through trickery or deceit," and invalidated the actions of the board.[315]

The outcomes of *VGS* and *Alderstein* were driven by the fact that the disadvantaged board member held a controlling equity stake or was the representative of a controlling stakeholder. In each case, the controllers could have exercised their voting power or contractual rights to alter the course of the board meeting at issue. By failing to provide sufficient notice of the board action, the fiduciaries breached their duties to the controlling stakeholder, which required the court to invalidate the actions of that meeting.[316]

---

[313] *Id.* at *9.

[314] *Id.*

[315] *Id.* at *11.

[316] Reasonable minds can debate whether the holdings of *VGS* and *Alderstein* are consistent with other decisions of this court and tenets of Delaware law generally. *See generally Klaassen*, 2013 WL 5967028, at *3–16 (discussing *VGS, Alderstein*, their progenitors and

In this case, unlike in *VGS* or *Alderstein*, Teller is the majority stakeholder, and Mehra lacked any contractual or other rights that would have enabled him to avoid the outcome of the September 26 Meeting, even if he had detailed advanced notice.[317] Thus, the nature by which the September 26 Meeting was convened does not provide a basis for invalidating the actions that took place at that meeting.

## III. CONCLUSION

For the foregoing reasons, the court enters judgment in favor of Defendants regarding the existence of deadlock and the validity of Holdco's dissolution. The parties are to confer on a path forward for litigating the remainder of Plaintiffs' claims.

---

progeny). Because both cases are factually distinguishable, this court need not reach that issue.

[317] The Delaware Supreme Court's recent affirmance in *Bäcker v. Palisades Growth Capital II, L.P.*, is distinguishable. *See* 2021 WL 140921 (Del. Jan. 15, 2021), *aff'g* 2020 WL 1503218 (Del. Ch. Mar. 26, 2020). There, the defendants affirmatively misled their fellow director. *Id.* at *12–15. The Supreme Court observed that the trial court "did not impose an equitable notice requirement by faulting the Bäckers for their silence," but rather, "[t]he court granted equitable relief because the Bäckers made misrepresentations designed to deceive their fellow directors." *Id.* at *18. There are no facts in this case demonstrating that Teller affirmatively misled Mehra.